756 P.2d 1057
**STATE of Idaho, Plaintiff–Respondent,**

v.

**David L. HENDERSON,
Defendant–Appellant.**

No. 16852.

Supreme Court of Idaho.

June 15, 1988.

Wishney & Elgee, Boise, for defendant-appellant. Robert J. Elgee argued.

Jim Jones, Atty. Gen., Myrna A.I. Stahman (argued), Deputy Atty. Gen., Boise, for plaintiff-respondent.

HUNTLEY, Justice.

We are here required to decide whether a police roadblock designed to detect and deter drunk driving is constitutionally permissible where the police have failed to obtain a judicial warrant, have no probable cause to believe the automobile driver is engaged in criminal wrongdoing, and lack legislative authority to establish a roadblock. The issue is whether the *warrantless search* is prohibited by the Idaho constitutional prohibition against unreasonable searches and seizures. In light of the individual's right of freedom from arbitrary governmental intrusion, and the questionable efficacy of roadblocks, we conclude that such roadblocks cannot withstand constitutional scrutiny. We reverse.

### A. FACTUAL AND PROCEDURAL BACKGROUND

On appeal from a judgment of conviction for driving while under the influence of alcohol (DUI), David Henderson contends that the roadblock at which he was stopped and subsequently arrested was an unreasonable search and seizure in violation of both the United States Constitution and the Idaho Constitution. Henderson moved to suppress all evidence of his intoxicated condition obtained during the stop on the basis that the evidence resulted from an unlawful seizure. Following a denial of that motion by the magistrate, Henderson entered a conditional plea of guilty. The district court, acting in an appellate capacity, affirmed the magistrate's judgment and sentence. Henderson now brings this appeal.

During Memorial Day weekend, the Boise City Police Department conducted a DUI roadblock on Main Street at its intersection with 29th Street, between midnight and two a.m. on Saturday, May 25, 1985. The chief of police approved the roadblock.

Also, advance announcement of the date, but not the exact location of the intended roadblock, was publicized for several weeks by the local news media. The site was selected because it was an area having a history of alcohol-related traffic violations as well as being a street with heavy traffic. The roadblock, starting on Main at about 18th Street, was visible for a number of blocks. A flashing arrow, merge signs, reflectorized barrels and traffic-control cones marked the area which funneled vehicles from five lanes into one. An adjacent parking lot was used for administering field-sobriety tests.

For the first five to ten minutes every vehicle was stopped. However, the resulting congestion prompted the roadblock commander either to stop vehicles on a sequence basis or to allow all vehicles to pass until the backup subsided. All drivers were given a pamphlet describing the purpose of the roadblock. By distributing the pamphlet, the officers could induce the driver to open his window and observe each driver for signs of intoxication, check for open containers, and signal the appropriate officer if a driver was believed to be intoxicated. If the particular car was not in the diverting pattern, but was believed to present a direct threat to the safety of those operating the roadblock, the car could be diverted.

Twenty-one uniformed police officers participated in the operation. Of the 942 drivers passing through the roadblock, 293 were diverted to an evaluation point. Eleven people, including David Henderson, were arrested for driving while intoxicated.

## B. CONSTITUTIONAL STANDARDS

Article 1, § 17 of the Idaho Constitution provides:

**Unreasonable searches and seizures prohibited.**—The right of the people to be secure in their persons, houses, papers and effects against unreasonable

searches and seizures shall not be violated; and *no warrant shall issue without probable cause* shown by affidavit, particularly describing the place to be searched and the person or thing to be seized. (Emphasis added).

The language of the fourth amendment to the United States Constitution is virtually identical.[1] The essence of the prohibition against unreasonable searches and seizures is to "safeguard the privacy and security of individuals against arbitrary invasions of governmental officials." *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); *Delaware v. Prouse*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1395, 59 L.Ed.2d 660 (1979). The fourth amendment grew out of colonial opposition to the infamous general warrants known as writs of assistance, which empowered British officers to search at will, and to break open receptacles or packages wherever they expected contraband. As the United States Supreme Court stated in *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980):

It is familiar history that indiscriminate searches and seizures conducted under the authority of "general warrants" were the immediate evils that motivated the framing and adoption of the Fourth Amendment. Indeed, as originally proposed in the House of Representatives, the draft contained only one clause, which directly imposed limitations on the issuance of warrants, but imposed no express restrictions on warrantless searches or seizures. As it was ultimately adopted, however, the Amendment contained two separate clauses, the first protecting the basic right to be free from unreasonable searches and seizures and the second requiring that warrants be particular and supported by probable cause....

It is thus perfectly clear that the evil the Amendment was designed to prevent was broader than the abuse of a general

---

1. United States Const.Amend. 4 provides:
   The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and *no warrants shall issue, but*

   *upon probable cause,* supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. (Emphasis added).

warrant. Unreasonable searches or seizures conducted without any warrant at all are condemned by the plain language of the first clause of the Amendment. Almost a century ago the Court stated in resounding terms that the principles reflected in the Amendment "reached farther than the concrete form" of the specific cases that gave it birth, and "apply to all invasions on the part of the Government and its employees of the sanctity of a man's home and the privacies of life." *Boyd v. United States*, 116 U.S. 616, 630 [6 S.Ct. 524, 532, 29 L.Ed. 746].

445 U.S. 573, at 483–485, 100 S.Ct. 1371 at 1378–1379 (footnotes omitted). Warrantless searches are deemed "unreasonable" *per se*, "subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967); *State v. Zapp*, 108 Idaho 723, 726, 701 P.2d 671, 674 (Ct.App.1985). The court stated in *Zapp* that there are three categories of encounters between citizens and the police. First is the arrest—a full scale seizure of the person, which the fourth amendment requires to be supported by probable cause. 108 Idaho at 726–727, 701 P.2d at 674–675. Second is the investigative detention—a seizure of limited duration which, when supported by a reasonable suspicion of criminal activity, falls within a judicially created exception to the fourth amendment. *Id. See, e.g., Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Third is voluntary contact, an encounter free of restraint or coercion outside the fourth amendment. *Zapp*, 108 Idaho at 727, 701 P.2d at 675. *See e.g., Florida v. Royer*, 460 U.S. 491, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983). When a vehicle is stopped by a police officer and its occupants are detained, a seizure within the fourth amendment of the United States Constitution and art. 1, § 17 of the Idaho Constitution has occurred, even if the purpose of the stop is limited and the resulting

detention is quite brief. *Delaware v. Prouse, supra*, 440 U.S. 648, 653, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979). *United States v. Martinez–Fuerte*, 428 U.S. 543, 556–558, 96 S.Ct. 3074, 3082–3083, 49 L.Ed. 2d 1116 (1976). Thus, at a minimum, precedent suggests that police have individualized suspicion of criminal wrongdoing prior to stopping the driver of an automobile. *Prouse, supra*. Significantly, all exceptions to the warrant requirement, including a limited *Terry* stop, require individualized suspicion.

In *Terry v. Ohio, supra*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, the Court stated that "the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure." The constitutionality of warrantless roadblocks is a question of first impression in Idaho. Neither this Court nor the Supreme Court of the United States has had occasion to determine whether police use of roadblocks constitutionally justifies recognition of a novel exception to the warrant requirement.

### C. THE TRAVESTY OF THE DRUNK DRIVER

Without question, the drunk driver is one of society's greatest concerns. In 1986, the last year for which information is available, there were 2,584 alcohol related accidents, which comprised 19.2 percent of all accidents which resulted in fatalities or injuries requiring hospitalization.[2] Authorities made 11,611 DUI arrests in 1986. *Id.* The state has a vital interest in promoting public safety by reducing alcohol-related traffic accidents and by ensuring the fitness of drivers behind the wheel. As was aptly stated by the district court in its memorandum decision:

> The weight of a motor vehicle, its ability to attain high speeds that can crush obstacles in its path, its ability to maim and extinguish human life is so great that the state has a compelling interest in insur-

2. Idaho Traffic Accident Analysis 1986, Idaho Transportation Department. Judicial notice may be taken of the public and private official acts of the executive department, such as its

publication of the Idaho Traffic Accident Analysis. I.C. § 9–101; *Howard v. Missman*, 81 Idaho 82, 337 P.2d 592 (1959) (judicial notice taken of

ing that those who operate vehicles on its streets and highways are not impaired by alcohol. The days of social tolerance for drunk drivers have passed. Society has come to realize the devastation caused by drunk drivers. The social cost in ruined lives is too great. It is estimated that drunk drivers kill 25,000 people a year. Annually they cause an estimated one million injuries and $5 billion worth of property damage. *See* "Curbing the Drunk Driver under the Fourth Amendment; The Constitutionality of Roadblock Seizures." 71 Geo.L.J. 1457 (1983). Memorandum Decision, pp. 23–24.

In *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), the Supreme Court of the United States commented on the gravity of the public concern in the following words:

> The situation underlying this case—that of the drunk driver—occurs with tragic frequency on our Nation's highways. The carnage caused by drunk drivers is well documented and needs no detailed recitation here. This Court, although not having the daily contact with the problem that the state courts have, has repeatedly lamented the tragedy. *See Breithaupt v. Abram*, 352 U.S. 432, 439, 77 S.Ct. 408, 412, 1 L.Ed.2d 448 (1957) ("The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield"); *Tate v. Short*, 401 U.S. 395, 401, 91 S.Ct. 668, 672, 28 L.Ed.2d 130 (1971) (BLACKMUN, J., concurring) (deploring "traffic irresponsibility and the frightful carnage it spews upon our highways"); *Perez v. Campbell*, 402 U.S. 637, 657, 672, 91 S.Ct. 1704, 1715, 1722, 29 L.Ed.2d 233 (1971) (BLACKMUN, J., concurring)

(footnote omitted) ("The slaughter on the highways of this Nation exceeds the death toll of all our wars"); *Mackey v. Montrym*, 443 U.S. 1, 17–19, 99 S.Ct. 2612, 2620–2621, 61 L.Ed.2d 321 (1979) (recognizing the "compelling interest in highway safety").

*Neville*, 459 U.S. at 558–59, 102 S.Ct. at 919–20.

As public concern over the drunk driver has grown recently, measures have been taken to strengthen laws against drunk driving. A decade ago, in many jurisdictions, driving under the influence was merely considered a petty traffic violation. The law today has increased the penalties for driving under the influence of alcohol. In Idaho, the convicted drunk driver is subject to up to six months imprisonment and a $1,000 fine, and is automatically stripped of his or her license to drive. I.C. § 18–8005. Quite simply, the state's interest can be characterized as compelling. Protecting citizens from life-threatening danger is a paramount concern.

## D. ROADBLOCKS ARE NOT AN EFFICIENT MEANS OF DETECTING OR DETERRING DRUNK DRIVING.

Although the state interest in limiting drunk driving is great, the efficacy of roadblocks is questionable. Boise Chief of Police Jim Montgomery stated that his general experience was that the same number of officers on patrol would make more DUI arrests than the same number of officers engaged in a roadblock. Tr., p. 75–76. Lieutenant Spears, the roadblock commander, acknowledged that it is more efficient to have well-trained officers on patrol for DUI than at a roadblock. Tr., p. 95. When asked if he could expect more arrests by

"Idaho Drivers Handbook" published under authority of Department of Law Enforcement).

The following chart shows the same statistics between 1982 and 1986:

| Year: | Alcohol Related Accidents: | Percentage of Accidents Resulting in Fatality or Serious Injury That Were Alcohol Related: | Number of DUI Arrests: |
|---|---|---|---|
| 1982 | 2,967 | 21.7 | 11,637 |
| 1983 | 2,857 | 20.4 | 12,096 |
| 1984 | 2,671 | 18.3 | 11,646 |
| 1985 | 2,401 | 17.4 | 11,047 |
| 1986 | 2,584 | 19.3 | 11,611 |

putting the same number of officers on the street for the same amount of time, Lieutenant Spears replied, "absolutely." Tr., p. 94. Thus, the testimony of the two police officials most responsible for the roadblock shows unequivocally that these warrantless searches conducted without any suspicion of criminal wrongdoing are *less* efficient than the normal stops based on probable cause. Therefore, roadblocks are an inefficient and *unnecessary* constraint on a person's right to remain free of search or seizure absent probable cause.

Lieutenant Spears testified that one of the purposes of the roadblock was to raise public awareness, so that drivers are deterred from driving while intoxicated. R., p. 98. However, if there were no arrests by the police, only "warnings," citizens would not be deterred from driving while drunk. People fear the loss of their license, jail, shame, and attorney fees, which result from the penal nature of the DUI offense. A roadblock is not an administrative search merely designed to raise awareness of the DUI problem. It is carried out by police—not OSHA or Health and Welfare officials—and if convictions are sustained, it has penal consequences. As the New Hampshire Supreme Court stated in holding a roadblock unconstitutional: "[T]here is nothing in this record, nor in decisions from other jurisdictions, to indicate that a roadblock program has any greater deterrent value than a well-publicized program of highly visible roving patrols." *State v. Koppel*, 127 N.H. 286, 499 A.2d 977, 982 (1985). A contrary view is stated by the Supreme Court of Virginia in *Lowe v. Commonwealth of Virginia*, 230 Va. 346, 337 S.E.2d 273 (1985), *cert. denied* 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986):

> [T]he deterrent effect of such a highly publicized program is obvious; such a visible project is bound to increase the perceived risk of arrest in the minds of those drunk drivers who are never arrested.

337 S.E.2d at 277. We cannot fairly conclude that the deterrent effect of sobriety roadblocks is negligible. Nevertheless, although the government interest in reducing alcohol related accidents is great, that end is not necessarily best served by a warrantless roadblock search, which yields fewer DUI arrests than does the usual procedure which first detects criminal wrongdoing.

## E. THE ABSENCE OF LEGISLATIVE AUTHORITY TO ESTABLISH A ROADBLOCK

For constitutional purposes, the action of an individual law enforcement officer is the action of the state itself. *Ex parte Virginia*, 100 U.S. (10 Otto) 339, 346–347, 25 L.Ed. 676 (1880). The roadblock in the instant case, however, was *not* conducted pursuant to authority granted by the Idaho legislature. If anything, the legislature disapproves of roadblocks conducted without evidence of criminal wrongdoing. In 1984 the legislature promulgated a "Report of the Joint Subcommittee on DUI," regarding the evidentiary test embodied in I.C. 18–8002. The report states:

> The committee has chosen to include probable cause [as a prerequisite] to stop and request that the exam be taken to *discourage* such practices as roadblocks which are strictly allowable only in certain situations as provided in I.C. § 19–621.

Idaho Senate Journal, Feb. 22, 1984, p. 96 (emphasis added).

Idaho Code § 19–621, which grants authority to establish roadblocks, does so only where it is reasonably believed that persons have broken the law. The statute provides:

> *Authority to establish road blocks.—* The duly elected or appointed sheriffs, state policemen or policemen of cities of the first or second class of the state of Idaho are hereby authorized to establish, in their respective or adjacent jurisdictions, temporary road blocks upon the highways of this state or city streets for the purpose of apprehending persons *reasonably believed by such officers to be wanted for violation of the laws of this state*, of any other state, or of the United States, and using such highways or streets. (emphasis added).

Consequently, not only are warrantless roadblocks relatively ineffective in that they yield fewer DUI arrests than does the normal procedure which first detects criminal wrongdoing, but also the police lack legislative authority to establish such roadblocks. The legislature has determined that suspicion of criminal wrongdoing is a condition precedent for authority to establish a roadblock. In the instant case, contrary to I.C. § 19–621, neither Henderson nor any other person was "reasonably believed by such officers to be wanted for violation of the law."

### F. THE LACK OF SUSPICION OF CRIMINAL WRONGDOING

Perhaps the most important attribute of our way of life in Idaho is individual liberty. A citizen is free to stroll the streets, hike the mountains, and float the rivers of this state without interference from the government. That is, police treat you as a criminal only if your actions correspond. Such is not the case with roadblocks. As the Court stated in *Commonwealth v. Tarbert*, [348 Pa.Super. 306] 502 A.2d 221 (1985):

> While the arguments supporting the constitutionality of systematic roadblocks are persuasive, the rationale supporting them is flawed. No amount of control or limited discretion can justify the "seizure" that takes place in the complete absence of probable cause or reasonable suspicion that a motor vehicle violation has occurred.

502 A.2d at 225–26. Of the states addressing the issue, 15 have suppressed evidence resulting from DUI roadblocks:

Arizona: *State ex rel. Ekstrom v. Justice Court of State* [136 Ariz. 1] 663 P.2d 992 (1983); Florida: *State v. Jones*, 483 So.2d 433 (1986); Indiana: *State v. McLaughlin*, 471 N.E.2d 1125 (1984); Massachusetts: *State v. McGeoghegan* [389 Mass. 137] 449 N.E.2d 349 (1983); Minnesota: *State v. Muzik*, 379 N.W.2d 599 (1985); Nebraska: *State v. Crom* [222 Neb. 273] 383 N.W.2d 461 (1986); New Jersey: *State v. Kirk* [202 N.J.Super. 28] 493 A.2d 1271 (1985); South Dakota: *State v. Olgaard*, 248 N.W.2d 392 (1976); Texas: *Webb v. State*, 695 S.W.2d 676 (1985); Vermont: *State v. Martin* [145 Vt. 562] 496 A.2d 442 (1985); Washington: *State v. Marchand* [104 Wash.2d 434] 706 P.2d 225 (1985); Oregon: *State v. Anderson*, 743 P.2d 715 (1987); New Hampshire: *State v. Koppel* [127 N.H. 286] 499 A.2d 977 (1985); Oklahoma: *State v. Smith*, 674 P.2d 562 (1984); Pennsylvania: *Commonwealth v. Tarbert* [348 Pa.Super. 306] 502 A.2d 221 (1985); Washington: *City of Seattle v. Mesiani*, [110 Wash.2d 454, 755 P.2d 775] (1988) (en banc).[3]

The Oregon Supreme Court reasoned as follows in *State v. Boyanovsky*, 304 Or. 131, 743 P.2d 711 (1987):

> This roadblock, however, like the roadblock held unconstitutional in *State v. Anderson*, 304 Or. 139, 743 P.2d 715 (1987), was used to gather evidence for defendant's criminal prosecution. Before the government officials can embark on a search or seizure for evidence to be used for this purpose, they must have individualized suspicion of wrongdoing.

---

**3.** Other courts have upheld roadblocks. *E.g., State v. Superior Court in and for County of Pima*, 143 Ariz. 45, 691 P.2d 1073 (1984); *Ingersoll v. Palmer*, 241 Cal.Rptr. 42, 743 P.2d 1299 (Cal.1987); *State v. Abelson*, 485 So.2d 861 (Fla. App.1986); *State v. Golden*, 171 Ga.App. 27, 318 S.E.2d 693 (1984); *Illinois v. Bartley*, 109 Ill.2d 273, 93 Ill.Dec. 347, 486 N.E.2d 880 (1985); *State v. Garcia*, 500 N.E.2d 158 (Ind.1986), *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987); *State v. Riley*, 377 N.W.2d 242 (Iowa App.1985); *State v. Deskins*, 234 Kan. 529, 673 P.2d 1174 (1983); *Kinslow v. Commonwealth*, 660 S.W.2d 677 (Ky.App.1983); *State v. Cloukey*, 486 A.2d 143 (Me.1985); *Little v. State*, 300 Md. 485, 479 A.2d 903 (1984); *Commonwealth v. Trumble*, 396 Mass. 81, 483 N.E.2d 1102 (1985); *Stark v. Perpich*, 590 F.Supp. 1057 (D.Minn. 1984); *Opinion of the Justices*, 128 N.H. 14, 509 A.2d 744 (1986); *State v. Coccomo*, 177 N.J.Super. 575, 427 A.2d 131 (1980); *City of Las Cruces v. Betancourt*, 105 N.M. 655, 735 P.2d 1161 (N.M.App.1987); *People v. Scott*, 63 N.Y.2d 518, 483 N.Y.S.2d 649, 473 N.E.2d 1 (1984); *People v. Torres*, 125 Misc.2d 78, 478 N.Y.S.2d 771 (1984); *People v. Peil*, 122 Misc.2d 617, 471 N.Y.S.2d 532 (1984); *State v. Alexander*, 22 Ohio Misc.2d 34, 489 N.E.2d 1093 (Ohio Mun.1985); *State v. Goines*, 16 Ohio App.3d 168, 474 N.E.2d 1219 (1984); *Lowe v. Commonwealth*, 230 Va. 346, 337 S.E.2d 273 (1985), *cert. denied*, 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986).

Further, unless they can show to a court's satisfaction, after the fact, that they did not have time to obtain a warrant, the authorities must have judicial authorization, in the form of a warrant, before the search or seizure.

743 P.2d at 712.

Similarly, the Oklahoma court in *State v. Smith*, 674 P.2d 562 (Okl.App.1984), stated:

The Court finds such activities by law enforcement authorities, while commendable in their ultimate goal of removing DUI offenders from the public highways, draw dangerously close to what may be referred to as a police state. Here, the state agencies have ignored the presumption of innocence, assuming that criminal conduct must be occurring on the roads and highways, and have taken an 'end justifies the means' approach. The Court is not so naive to think that criminal conduct does not occur regularly in the form of DUI offenders. Yet, a basic tenet of American jurisprudence is that the government cannot assume criminal conduct in effectuating a stop such as the one presented herein. Were the authorities allowed to maintain such activities as presented in this case, the next logical step would be to allow similar stops for searching out other types of criminal offenders. For example, it is well known to the public that shoplifting is an everyday occurrence which constantly plagues merchants in Oklahoma and elsewhere. Are law enforcement authorities then to be allowed to establish fixed checkpoints, permanent or otherwise, outside of every shopping center in the area to question all exiting shoppers as to whether they possess sales receipts? Are law enforcement authorities to be allowed to demand all shoppers to produce such receipts or be subject to arrest everytime they go shopping? The potential for abuse is apparent.

674 P.2d at 564–65.

The states of Oregon, Oklahoma, and Washington have adopted *per se* rules

which provide that drunk driver roadblocks are unconstitutional under any circumstance. *See State v. Boyanovsky, supra,* 304 Or. 131, 743 P.2d 711 (1987); *State v. Smith, supra,* 674 P.2d 562 (Okl.App.1984); and *City of Seattle v. Mesiani, supra,* 110 Wash.2d 454, 755 P.2d 775 (1988) (en banc). However, we decline to adopt such a rigid rule.

The Idaho legislature has not provided police with statutory authority to establish roadblocks, nor has the legislature promulgated rules of procedures under which a magistrate or district judge can issue a warrant to authorize the police to conduct a roadblock designed to apprehend drunk drivers. Legislators elsewhere have utilized such an approach. For example, in New Hampshire a trial court must make an affirmative finding that the intrusion upon individualized rights of privacy is outweighed by the public interest prior to authorizing a roadblock to apprehend intoxicated drivers. *See Opinion of the Justices,* note 3 *supra,* 128 N.H. 14, 509 A.2d 744 (1986). However, such facts are not now before us. We therefore express no view as to the constitutionality of roadblocks established with prior judicial authorization pursuant to legislative authority.[4]

Accordingly, we hold that where police lack express legislative authority, particularized suspicion of criminal wrongdoing and prior judicial approval, roadblocks established to apprehend drunk drivers cannot withstand constitutional scrutiny. Although the United States Supreme Court has not yet decided whether warrantless roadblocks violate the federal constitution, we base our decision today solely on art. 1, § 17 of the Idaho Constitution. The Idaho Constitution can, where appropriate, grant more protection than its federal counterpart. *See Gibson v. State,* 110 Idaho 631, 635, 718 P.2d 283, 287 (1986); *State v. Johnson,* 110 Idaho 516, 520 n. 1, 716 P.2d 1288, 1292 n. 1 (1986); *State v. Newman,*

---

4. Similarly, we express no view as to the constitutionality of roadblocks established pursuant to administrative order, for example, where officials enforce fish and game or commercial trucking regulations. *Cf. Ingersoll v. Palmer*, 43

Cal.3d 1321, 241 Cal.Rptr. 42, 743 P.2d 1299 (1987); *see also* Note, Administrative Searches and the Fourth Amendment: An Alternative to the Warrant Requirement, 64 Cornell L.Rev. 856 (1979).

108 Idaho 5, 10 n. 6, 696 P.2d 856, 861 n. 6 (1985); *State v. Lewis,* 107 Idaho 616, 618, 691 P.2d 1231, 1233 (1984). *See also, Pruneyard Shopping Center v. Robins,* 447 U.S. 74, 81, 100 S.Ct. 2035, 2040, 64 L.Ed.2d 741 (1980) (each state has the *"sovereign* right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution.") (emphasis added).

## G. CONCLUSION

■ Because the evidence used to convict the appellant was unconstitutionally obtained pursuant to a warrantless search, prior to which the police lacked individualized suspicion of criminal wrongdoing and authority to establish a roadblock, the magistrate erred in denying appellant's motion to suppress. Accordingly, the judgment of conviction is reversed.

No costs on appeal.

BISTLINE, J., and McFADDEN, J. Pro Tem., concur.

WALTERS, Judge Pro Tem., dissenting.

With all due respect, I dissent from the foregoing opinion. The sole, dispositive issue in this case is whether the sobriety checkpoint was constitutionally permissible. I believe that it was.

For a clearer understanding of my approach to this case, a more detailed recital of the facts developed below is necessary. The undisputed facts show that the Boise City Police Department established a sobriety checkpoint on Main Street at its intersection with 29th Street, between midnight and two a.m. on Saturday, May 25, 1985. This roadblock was the culmination of several months of study by the police department. The officers at the checkpoint followed written standards that had been formulated by supervisory personnel. The chief of police approved the preconceived plan. Advance announcement of the date, but not the exact location of the intended roadblock, was publicized for several weeks in the local news media. The site was selected because it was in an area having an established history of alcohol-related traffic violations, was on a street with heavy traffic volume, was readily visible to the general public, and insured the safety of the motorists and officers involved. The roadblock was visible for a number of blocks on Main Street, starting at about 18th Street. The street was well lighted with artificial illumination at night. Two marked police cars with flashing overhead lights were positioned at the beginning of the roadblock to warn motorists of the oncoming obstacle. Three other marked police cars with flashing overhead lights were at the location. In addition, large flashing signs displaying the word "roadblock" were positioned near the entrance of the checkpoint. A flashing arrow, merge signs, reflectorized barrels and traffic-control cones marked the area which funneled vehicles from five lanes into one. An adjacent parking lot was used for administering field-sobriety tests. Motorists could turn off Main Street and avoid the roadblock until 25th Street. Motorists could also park their cars and walk away up to the entry point around 27th Street. No motorists were stopped for avoiding the roadblock.

For the first five to ten minutes every vehicle was stopped, however, the resulting congestion prompted the roadblock commander to either stop vehicles on a sequence basis or to allow all vehicles to pass until the backup subsided. All drivers were given a pamphlet describing the purpose of the roadblock. By distributing the pamphlet, the officers could observe each driver for signs of intoxication, check for open containers, and signal the appropriate officer if a driver was believed to be a hazard. If the particular car was not in the diverting pattern, but was believed to present a direct threat to the safety of those operating the roadblock, the car could be diverted. Most motorists, those who were not evaluated, generally passed through the roadblock within twenty seconds to two minutes.

Twenty-one uniformed police officers participated in the operation. Of the 942 drivers passing through the roadblock, 293 were diverted to an evaluation point. Elev-

en people, including David Henderson, were arrested for driving while intoxicated.

The purpose of the roadblock was explained by the following testimony at the hearing on Henderson's motion to suppress. In sum, the purpose was primarily to promote public safety by deterring drunk driving rather than to discover evidence of criminal activity.

Q. [Ms. Mimura, counsel for the state].... What's the whole purpose of the roadblock?
A. [Sergeant Thompson] The purpose of the roadblock was to attempt to deter drinking and driving under the influence....

.    .    .    .    .

Q. [Mr. Elgee, counsel for defendant, Henderson] You said that the—I think, in response to a question that your main purpose for setting up the roadblock was an attempt to deter drinking and driving, isn't that correct?
A. [Sergeant Thompson] That's true.

.    .    .    .    .

Q. It wasn't necessary to apprehend drinking drivers, it's main purpose was deterrence, right?
A. That's a (indiscernible) function, yes.

.    .    .    .    .

Q. Well, what is your testimony in that respect then?
A. My testimony is that there are many facets to enforcement. One, is enforcement itself; another is public information education and when you arrest an individual as an individual officer, you are affecting one individual and probably someone that he might talk to. If you set up a roadblock and you publicize that, the community gets involved in the process and they themselves are the ones who deter the drunk drivers. They conform to some standard of sanity as far as drinking is concerned or they put pressure on people at various times throughout a day or a week or month and they become the effective part of the enforcement program at that point.
Q. So, I take it that basically what you are telling me is that unrelated to simply apprehending drunk drivers, you are interested in publicizing the problem through roadblocks and using it as a deterrent on other people who might be interested in drunk driving?
A. Along with giving the impression that you have a much greater chance of being detected, which you do, through a roadblock and that is true, yes.
Q. So, the answer to my question is "yes"?
A. Yes.
Q. Just so we are clear here, publicity plays a great part in your decision to have a roadblock?
A. No. I'm thinking of two ways that you could be meaning that. One is that because of publicity, we would implement a roadblock. The other is that we would implement a roadblock hoping that it becomes noticed in the public eye. If that was the point we were trying to make, then the education portion of that is what we are attempting to affect. The mere publicity of it has no meaning, whatsoever.
Q. The education effect is one of the primary reasons that you had the roadblock?
A. That's true.
Q. If not the primary reason?
A. If not, yes. The primary reason is to get the drunk driver off the road.

.    .    .    .    .

A. [Lt. Spears] ... I looked at this from a public education, psychological point of view and that's the reason I did it.
Q. [Mr. Elgee] Okay, That's one of the major considerations in setting up a roadblock, wasn't it?
A. That's absolutely correct.

.    .    .    .    .

Q. [Ms. Mirmura] How do you feel this one was?
A. [Lt. Spears] Terribly effective.
Q. In what way?
A. We have generated an incredible amount of media concern. We've had a number of letters that were written to the police department, a number of let-

ters that were written to the editor. We have been on T.V. talk shows, channel 6, to be specific. We've been interviewed for channel 4. We have created an immense public education (indiscernible) and we needed that—desperately needed that because we were going to voluntary compliance.

．　　．　　．　　．　　．

A. [Officer Fost] This was a DUI roadblock, so if they had an open container, you know, we told them it was against the laws to have an open container in Boise, but, you know, there was no citations issued, you know, that was not the purpose.

The efficacy of the roadblock in terms of DUI arrests was in dispute. One officer testified that a roadblock was a more efficient method of detecting drunk drivers because in less than two hours, eleven drunk drivers were detected. Two others testified that officers on patrol would make more DUI arrests than the same number of officers engaged in a roadblock. However, efficiency of DUI arrests was not the primary consideration of the roadblock according to Lieutenant Spears. Sergeant Thompson testified that there were no fatalities involving drinking drivers in Boise during that weekend.

At the time of the roadblock stop, there was no probable cause to believe that David Henderson, the appellant in this case, was driving while intoxicated. Henderson's vehicle was not stopped based upon his driving pattern or upon other objective physical observations for purposes of I.C. § 18–8002, Idaho's DUI statute. After being stopped, an officer trained in DUI detection gave Henderson a standard speech with words to the effect: "Good evening. This is the Boise Police Department roadblock. We are testing all drivers for being under the influence. Would you mind taking the gaze nystagmus test?"[1] Henderson took the test and failed, at which point the officer asked him to pull his pickup over, step out and perform five other field-sobriety tests. Henderson performed these tests "very poorly" in the opinion of the police officer, and was placed under arrest.

I

Henderson asserts that DUI roadblocks are *per se* unconstitutional. He contends that sobriety checkpoints are an unreasonable interference with individual liberties, considering that there are less intrusive ways to combat the problem of drunk drivers. On the other side, the state argues that properly conducted DUI roadblocks are constitutionally permissible because the compelling state interest in highway traffic safety outweighs the minor intrusion by brief, nonarbitrary and systematic inspections.[2] After reviewing and comparing the

1. The "gaze nystagmus" test is a method of detecting whether a person is under the influence of alcohol, by observing the movement of that person's eyes.

2. Only the states of Oklahoma, Washington, and perhaps Oregon, appear to have held sobriety roadblocks to be *per se* unconstitutional. See *State v. Smith*, 674 P.2d 562 (Okla.Crim.App. 1984); *City of Seattle v. Mesiani*, 110 Wash.2d 454, 755 P.2d 775 (1988); and *Nelson v. Lane County*, 304 Or. 97, 743 P.2d 692 (1987) (per Peterson, C.J., dissenting). On the other hand, decisions from the courts of twenty-four other states have uniformly rejected a *per se* rule. Those states are: Arizona, California, Florida, Georgia, Illinois, Indiana, Iowa, Kansas, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Nebraska, New Hampshire, New Jersey, New Mexico, New York, Ohio, Pennsylvania, South Dakota, Texas, Vermont and Virginia.

Cases from nineteen jurisdictions upholding sobriety checkpoints include: *State v. Superior Court in and for County of Pima*, 143 Ariz. 45, 691 P.2d 1073 (1984); *Ingersoll v. Palmer*, 43 Cal.3d 1321, 241 Cal.Rptr. 42, 743 P.2d 1299 (1987); *State v. Abelson*, 485 So.2d 861 (Fla.App. 1986); *State v. Golden*, 171 Ga.App. 27, 318 S.E.2d 693 (1984); *Illinois v. Bartley*, 109 Ill.2d 273, 93 Ill.Dec. 347, 486 N.E.2d 880 (1985); *State v. Garcia*, 500 N.E.2d 158 (Ind.1986), *cert. denied* 481 U.S. 1014, 107 S.Ct. 1889, 95 L.Ed.2d 496 (1987); *State v. Riley*, 377 N.W.2d 242 (Iowa App.1985); *State v. Deskins*, 234 Kan. 529, 673 P.2d 1174 (1983); *Kinslow v. Commonwealth*, 660 S.W.2d 677 (Ky.App.1983); *State v. Cloukey*, 486 A.2d 143 (Me.1985); *Little v. State*, 300 Md. 485, 479 A.2d 903 (1984); *Commonwealth v. Trumble*, 396 Mass. 81, 483 N.E.2d 1102 (1985); *Stark v. Perpich*, 590 F.Supp. 1057 (D.Minn. 1984); *Opinion of the Justices*, 128 N.H. 14, 509 A.2d 744 (1986); *State v. Coccomo*, 177 N.J.Super. 575, 427 A.2d 131 (1980); *City of Las Cruces v. Betancourt*, 105 N.M. 655, 735 P.2d 1161 (N.M.App.1987); *People v. Scott*, 63 N.Y.2d 518,

authorities I have found on this question, I am of the opinion the rule suggested by Henderson—that sobriety roadblocks are unconstitutional *per se* —should not be followed. Rather, I am persuaded by the overwhelming weight of authority which allows a determination of constitutional validity of sobriety checkpoints, under analyses circumspecting the reasonableness of the activity.

As noted in the majority opinion, the United States Supreme Court has not yet ruled on the constitutionality of the DUI roadblock. However, that Court has considered the legality of an investigative stop where the officer did not have probable cause or reasonable suspicion to believe criminal activity was under way. In *United States v. Brignoni–Ponce*, 422 U.S. 873, 95 S.Ct. 2574 (1975), the Supreme Court invalidated roving border-patrol stops made without probable cause to believe that the occupants were violating immigration laws. The seizure was held to be unreasonable because of the broad discretion left to officers in the field and the frightening aspect of a random nighttime stop. The following year, in *United States v. Martinez–Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), the Supreme Court upheld warrantless stops at permanent checkpoints for the purpose of discovering immigration law violators. The Court balanced the reasonableness of physical and procedural factors against the public interest served by the minimal intrusion. The crucial distinction between the stop in *Brignoni–Ponce* and the stop in *Martinez–Fuerte*, was the lesser intrusion upon the motorist's fourth amendment interests. "At traffic checkpoints the motorists can see that the other vehicles are being stopped, he can see visible signs of the officer's authority, and he is much less likely to be frightened or annoyed by the intrusion." *United States v. Ortiz*, 422 U.S. 891, 894, 95 S.Ct. 2585, 2588, 45 L.Ed.2d 623 (1975), quoted in *Martinez–Fuerte*, 428 U.S. at 558, 96 S.Ct. at 3083.

In a subsequent case, *Brown v. Texas*, 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979), the Supreme Court invalidated a Texas statute which made it a crime to refuse to identify oneself to a police officer upon request, in part because the risk of arbitrary and abusive police practices exceeded tolerable limits. Finally, in *Delaware v. Prouse*, 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), the Supreme Court denounced selective, single-car stops for checking licenses and registrations but opined that states could develop means less intrusive than random stops, such as roadblocks for permissible, warrantless spot checks. The Court's conclusion in *Prouse* is often cited by state courts holding that DUI roadblocks are permissible if they meet certain criteria:

> This holding does not preclude the State of Delaware or other States from developing methods for spot checks that in-

---

483 N.Y.S.2d 649, 473 N.E.2d 1 (1984); *People v. Torres*, 125 Misc.2d 78, 478 N.Y.S.2d 771 (1984); *People v. Peil*, 122 Misc.2d 617, 471 N.Y.S.2d 532 (1984); *State v. Alexander*, 22 Ohio Misc.2d 34, 489 N.E.2d 1093 (Ohio Mun.1985); *State v. Goines*, 16 Ohio App.3d 168, 474 N.E.2d 1219 (Ohio App.1984); *Lowe v. Commonwealth*, 230 Va. 346, 337 S.E.2d 273 (1985), *cert. denied*, 475 U.S. 1084, 106 S.Ct. 1464, 89 L.Ed.2d 720 (1986).

In the following cases, sobriety checkpoint stops have been held invalid—not on the basis that such stops were *per se* unconstitutional—but because the particular circumstances of each of the stops were not such that the court could conclude the roadblock under review was a reasonable seizure: *State ex rel. Ekstrom v. Justice Court of State*, 136 Ariz. 1, 663 P.2d 992 (1983); *State v. Jones*, 483 So.2d 433 (Fla.1986); *State v. McLaughlin*, 471 N.E.2d 1125 (Ind.App. 1984); *Commonwealth v. Amaral*, 398 Mass. 98, 495 N.E.2d 276 (1986); *Commonwealth v.*

*McGeoghegan*, 389 Mass. 137, 449 N.E.2d 349 (1983); *State v. Muzik*, 379 N.W.2d 599 (Minn. App.1985); *State v. Crom*, 222 Neb. 273, 383 N.W.2d 461 (1986); *State v. Koppel*, 127 N.H. 286, 499 A.2d 977 (1985); *State v. Egan*, 213 N.J.Super. 133, 516 A.2d 1115 (1986); *State v. Kirk*, 202 N.J.Super. 28, 493 A.2d 1271 (1985); *State v. Olgaard*, 248 N.W.2d 392 (S.D.1976); *Webb v. State*, 695 S.W.2d 676 (Tex.App.1985); *State v. Martin*, 145 Vt. 562, 496 A.2d 442 (1985).

Finally, in *Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (Pa.1987), the Pennsylvania Supreme Court recently held that although a sobriety checkpoint may be constitutionally acceptable by the manner in which it is managed and conducted, and the Pennsylvania legislature apparently had authorized such roadblocks beginning in 1985, the court found that the two checkpoints under review in *Tarbert* had occurred prior to 1985, during a time when such roadblocks were prohibited by statute.

volve less intrusion or that do not involve the unconstrained exercise of discretion. Questioning all oncoming traffic at road-block-type stops is one possible alternative. *Id.* at 663, 99 S.Ct. at 1401. These Supreme Court cases provide a framework for the analysis of the constitutionality of the DUI roadblock in question, to which I now turn.

The premise to the constitutional challenge is the fourth amendment to the United States Constitution which guarantees "the right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures" and that "no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." Article 1, § 17 of the Idaho Constitution is almost identical in language and exactly identical in purpose to the fourth amendment. *State v. Arregui,* 44 Idaho 43, 254 P. 788 (1927). While federal law establishes minimal constitutional protections, the state has the power to impose higher standards on searches and seizures than those required of the United States Constitution. *Cooper v. California,* 386 U.S. 58, 87 S.Ct. 788, 17 L.Ed.2d 730 (1967). However, the Idaho Supreme Court has construed art. 1, § 17 of the Idaho Constitution *in pari materia* or as the functional equivalent of the fourth amendment. Therefore consideration of the conduct in question—a DUI roadblock—under construction of the fourth amendment by case law is instructive and highly persuasive, if not controlling. *Cf. State v. Cowen,* 104 Idaho 649, 662 P.2d 230 (1983); *State v. Oropeza,* 97 Idaho 387, 545 P.2d 475 (1976); *State v. Peterson,* 81 Idaho 233, 340 P.2d 444 (1959); Arregui, *supra.* In this same vein, the Pennsylvania Supreme Court recently noted:

> While we are mindful of the limited nature of the protections guaranteed by the federal Constitution, we nonetheless find the large body of federal Fourth Amendment jurisprudence instructive and will accord weight to federal court decisions in interpreting Pennsylvania's constitutional protections where those decisions "are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, ...." Brennan, *State Constitutions and the Protection of Individual Rights,* 90 Harv.L.Rev. 489, 502 (1977), quoted in *Commonwealth v. Sell,* [504 Pa. 46, 49, 470 A.2d 457, 459 (1983)].

*Commonwealth v. Tarbert,* 517 Pa. 277, 283–284, 535 A.2d 1035, 1038 (Pa.1987). The pivotal point of the inquiry, then, is whether the conduct in question was reasonable, for it would be a curious result indeed—and perhaps an unwise judicial policy—to hold the conduct unreasonable under the Idaho Constitution if the same conduct appeared clearly to pass muster under the federal constitution, in light of the similarity in the language of the two constitutional provisions.

The essence of the prohibition against unreasonable searches and seizures is to "safeguard the privacy and security of individuals against arbitrary invasions of governmental officials." *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967); *Prouse,* 440 U.S. at 653, 99 S.Ct. at 1395. The fourth amendment does not forbid all searches and seizures, but rather *unreasonable* searches and seizures. *Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446 (1960). There is no ready test for determining reasonableness of a search and seizure other than by balancing the need to search or seize against the invasion which the search or seizure entails. *Terry v. Ohio,* 392 U.S. 1, 21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *Camara,* 387 U.S. at 534–537, 87 S.Ct. at 1735. The Supreme Court articulated a balancing test in *Brown, supra:*

> Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with individual liberty. [Citations omitted.]

.   .   .   .   .

A central concern in balancing these competing considerations in a variety of settings has been to assure that an individual's reasonable expectation of privacy is not subject to arbitrary invasions solely at the unfettered discretion of officers in the field. [Citations omitted.]

443 U.S. at 50–51, 99 S.Ct. at 2640.

Clearly, stopping a vehicle and detaining its passengers constitutes a "seizure" within the ambit of the fourth amendment even though the investigatory stop is brief and limited in purpose. *Prouse*, 440 U.S. at 655, 99 S.Ct. at 1396; *Martinez–Fuerte*, 428 U.S. at 556–558, 96 S.Ct. at 3082–83; *Brignoni–Ponce*, 422 U.S. at 878, 95 S.Ct. at 2578. In California, a sobriety checkpoint program recently was challenged on the ground that there was no individualized suspicion of wrongdoing evident, preceding the vehicular stops. The California Supreme Court, in response to that argument, said:

> If the primary purpose of the stop here were to detect crime or gather evidence of crime, we would agree with the contention that an individualized suspicion of wrongdoing is required. But, as we shall explain, the primary purpose of the stop here was not to discover evidence of crime or to make arrests of drunk drivers but to promote public safety by deterring intoxicated persons from driving on the public streets and highways. We therefore conclude the propriety of the sobriety checkpoint stops involved here is to be determined not by the standard pertinent to traditional criminal investigative stops, but rather by the standard applicable to investigative detentions and inspections conducted as part of a regulatory scheme in furtherance of an administrative purpose.

*Ingersoll v. Palmer*, 43 Cal.3d 1321, 241 Cal.Rptr. 42, 47, 743 P.2d 1299, 1303–04 (Cal.1987). Because the checkpoint was primarily for the regulatory purpose of keeping intoxicated drivers off the highways, to the end of enhancing public safety, the court likened the roadblock to an airport search. The court said:

> The sobriety checkpoint presents a compelling parallel to the airport screening search. While the label "administrative search" is open to some criticism in application to either the airport search or the sobriety checkpoint stop, both, although they operate mechanically as a search or inspection for the violation of law, actually serve a primary and overriding regulatory purpose of promoting public safety. Their primary purpose is to prevent and deter conduct injurious to persons and property; they are not conventional criminal searches and seizures. The fact that sobriety checkpoint stops will lead to the detection of some individuals involved in criminal conduct does not alter the fundamental regulatory character of the screening procedure.

*Id.* at 49–50, 743 P.2d at 1306.

As stated above in *Brown*, the reasonableness of the seizure is determined by balancing the legitimate governmental interest and the degree to which the seizure advances that interest against the severity of the intrusion on the individual's fourth amendment rights. In the case at hand, the need of society to reduce the frightening slaughter on our highways caused by drunk drivers should be balanced against the rights of citizens to move freely about on the highways. Thus, I turn next to a discussion of the *Brown* factors and the balancing test.

1. *Governmental Interest.* The state has a vital interest in promoting public safety by reducing alcohol-related traffic accidents and by ensuring the fitness of drivers behind the wheel. As aptly stated by the district court below in its memorandum decision:

> There is a strong public interest in preventing seriously intoxicated people from driving and in apprehending DUI offenders. There is an overwhelming need to reduce the number of drunk drivers on the road. The carnage caused by drunk drivers is a matter of the gravest public concern. The United States Supreme Court indicated that a state's compelling interest in enforcing its vehicle registration and driver's license require-

ments might be so substantial that a roadblock would be warranted. Clearly, the state's interest in protecting its citizens from destruction of drunken drivers is far greater. The weight of a motor vehicle, its ability to attain high speeds that can crush obstacles in its path, its ability to maim and extinguish human life is so great that the state has a compelling interest in insuring that those who operate vehicles on its streets and highways are not impaired by alcohol. The days of social tolerance for drunk drivers have passed. Society has come to realize the devastation caused by drunk drivers. The social cost in ruined lives is too great. It is estimated that drunk drivers kill 25,000 people a year. Annually they cause an estimated one million injuries and $5 billion worth of property damage. *See* "Curbing the Drunk Driver under the Fourth Amendment: The Constitutionality of Roadblock Seizures." 71 Geo.L.J. 1457 (1983).

In *South Dakota v. Neville*, 459 U.S. 553, 103 S.Ct. 916, 74 L.Ed.2d 748 (1983), the Supreme Court commented about the gravity of the public concern in the following words:

> The situation underlying this case— that of the drunk driver—occurs with tragic frequency on our Nation's highways. The carnage caused by drunk drivers is well documented and needs no detailed recitation here. This Court, although not having the daily contact with the problem that the state courts have, has repeatedly lamented the tragedy. *See Breithaupt v. Abram*, 352 U.S. 432, 439, 77 S.Ct. 408, 412, 1 L.Ed.2d 448 (1957) ("The increasing slaughter on our highways, most of which should be avoidable, now reaches the astounding figures only heard of on the battlefield"); *Tate v. Short*, 401 U.S. 395, 401, 91 S.Ct. 668, 672, 28 L.Ed.2d 130 (1971) (BLACKMUN, J., concurring) (deploring "traffic irresponsibility and the frightful carnage it spews upon our highways"); *Perez v. Campbell*, 402 U.S. 637, 657, 672, 91 S.Ct. 1704, 1715, 1722, 29 L.Ed.2d 233 (1971) (BLACKMUN, J., concurring) (footnote omitted) ("The slaughter on the highways of this Nation exceeds the death toll of all our wars"); *Mackey v. Montrym*, 443 U.S. 1, 17–19, 99 S.Ct. 2612, 2620–2621, 61 L.Ed.2d 321 (1979) (recognizing the "compelling interest in highway safety").

*Id.* 459 U.S. at 558–59, 103 S.Ct. at 919–20.

Quite simply, the state's interest can be characterized as compelling. Protecting citizens from life-threatening dangers is a paramount concern.

2. *Individual Interests.* The right to operate a motor vehicle on a public road in Idaho is not a natural or unrestricted right, but a privilege granted by the state subject to revocation, cancellation or suspension under certain conditions. *Gordon v. State,* 108 Idaho 178, 697 P.2d 1192 (Ct.App.1985). The enjoyment of the privilege is subject to reasonable regulations by the state to ensure safety, good order and the public welfare. As such, the State of Idaho requires vehicle registration, I.C. §§ 49–101 to 49–158; liability insurance, I.C. § 49–233; driver's licenses, I.C. §§ 49–301 to 49–358; obedience to traffic rules, I.C. §§ 49–601 to 49–761A; and safe equipment, I.C. §§ 49–801 to 49–849. This statutory scheme is for the purpose of protecting citizens from incompetent drivers, negligent vehicle operation, financially irresponsible drivers, and unsafe vehicles. Operating a motor vehicle is a highly regulated activity, therefore the driver accepts the regulatory burden along with the benefit of using the public roads.

As to the privacy issue, the court in *Commonwealth v. Leninsky*, 360 Pa.Super. 49, 53–54, 519 A.2d 984, 987 (1986), succinctly said:

> However, "one's expectation of privacy in an automobile and freedom in its operation are significantly different from the traditional expectation of privacy and freedom in one's residence." *United States v. Martinez-Fuerte*, 428 U.S. 543, 561, 96 S.Ct. 3074, 3084, 49 L.Ed.2d 1116 (1976); *see also Commonwealth v. Shaffer*, 447 Pa. 91, 103, 288 A.2d 727, 734 (1972). "One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repos-

itory of personal effects." *Cardwell v. Lewis,* 417 U.S. 583, 590, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974). "Automobiles, unlike homes, are subject to pervasive and continuing, governmental regulation and controls, including periodic inspection and licensing requirements." *South Dakota v. Opperman,* 428 U.S. 364, 368, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976). Nonetheless, "[a]n individual operating or traveling in an automobile does not lose all reasonable expectation of privacy simply because the automobile and its use are subject to government regulation." *Delaware v. Prouse,* 440 U.S. 648, 662, 99 S.Ct. 1391, 1400, 59 L.Ed.2d 660 (1979).

Further, the Oregon Supreme Court said in *State v. Tourtillott,* 289 Or. 845, 618 P.2d 423 (1980):

> The Supreme Court has, for many years, distinguished between searches of premises and searches of automobiles. This point was made by the Supreme Court in its recent border patrol cases. See the concurring opinion of Justice Powell in *Almeida–Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). Justice Powell opined:
>
>> " * * * The search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person or of a building. This Court 'has long distinguished between an automobile and a home or office.' * * * "
>
> . . . .
>
> One's expectation of privacy and freedom in the operation of an automobile is significantly less than the expectation of freedom and privacy in one's home. A stop of one's automobile is a minimal intrusion compared to a search of one's home.

*Id.* 618 P.2d at 432–33.

Clearly, a person has a reduced expectation of privacy in an automobile because of its mobility, visibility and regulation. Once a person operates such a dangerous instrumentality on a public road, that person impliedly consents to reasonable law enforcement techniques to assure compliance with appropriate highway safety standards. See I.C. § 18–8002.

Here, the intrusion of the individual's right to travel freely was momentarily impeded at a fixed point in a systematic way, unless the driver was impaired. The purpose was not to search the vehicle for contraband, but rather to check the competency of the driver. The motorist was not taken by undue surprise nor subjected to arbitrary, abusive or harassing police behavior. For the most part the inconvenience appears to have been slight, and could easily have been avoided altogether. The reasonableness of the procedures followed by the Boise Police Department (discussed below), also made the intrusion minimal.

3. *Advancement of the Public Interest.* The degree to which the DUI roadblock advanced the public interest was disputed in the proceedings below. In terms of public awareness, the message of "don't drink and drive" was perhaps a success, although empirical data is scarce. No alcohol-related traffic fatalities occurred during the weekend. I surmise that the prior notice deterred some persons from driving while intoxicated. In terms of apprehending drunk drivers, the same number of officers on patrol would probably make more DUI arrests than those officers involved in the roadblock. However, detection was secondary to the goal of educating the public about the problems and consequences of driving while intoxicated. The California Supreme Court has noted that the number of arrests does not necessarily measure the effectiveness of the sobriety checkpoint. "If the checkpoint is properly serving its function—deterrence—it may result in no arrests at all." *Ingersoll v. Palmer,* 43 Cal.3d 1321, 241 Cal.Rptr. 42, 55, 743 P.2d 1299, 1311 (1987).

As the court said in *State v. Garcia,* 500 N.E.2d 158 (Ind.1986):

> ... Future deterrence can only be speculative, but as the Supreme Court of Virginia stated in *Lowe v. Commonwealth of Virginia* (1985), 230 Va. 346, 337 S.E. 2d 273, 277, *cert. denied* 475 U.S. 1084,

106 S.Ct. 1464, 89 L.Ed.2d 720 (1986), in upholding a similar roadblock program:

"[T]he deterrent effect of such a highly publicized program is obvious; such a visible project is bound to increase the perceived risk of arrest in the minds of those drunk drivers who are never arrested."

*Id.* at 162.

Further, the court in *Commonwealth v. Leninsky*, 360 Pa.Super. 49, 519 A.2d 984 (1986), said:

Sobriety checkpoints serve the public interest in two ways: (1) they serve as a deterrent to potential drunk drivers by increasing the actual perceived risk of detection; and (2) they aid in apprehending and removing drunk drivers from the road. Use of sobriety checkpoints and roadblocks for these purposes is recommended by the National Highway Traffic Safety Administration (NHTSA), the Presidential Commission on Drunk Driving, the International Association of Chiefs of Police, and the National Transportation Safety Board (NTSB).

A 1984 safety study by the National Transportation Safety Board indicated that without sobriety checkpoint programs, many alcohol impaired drivers believe they can avoid police detection by driving carefully. However, with the use of sobriety checkpoints, the general public's perception of the probability of detection and sanction is increased. I note that the public perception has a strong basis in fact. While those drunk drivers arrested by roving patrols average a .169 to .20 blood alcohol content (BAC) level, drunk drivers arrested at Delaware sobriety checkpoints averaged a .14 BAC level. In light of the fact that a driver with a .10 BAC level has a six times greater likelihood of causing an accident than a sober driver, the effectiveness of sobriety checkpoints in detecting and removing drunk drivers with *dangerous* but significantly lower BAC levels is significant.

Furthermore, studies in Maryland and Delaware have indicated that the uses of sobriety checkpoints have led to significant decreases in alcohol related accidents, injuries, and fatalities. Longer and more comprehensive studies of the effect of sobriety checkpoints programs in Australia, France, Canada and Sweden indicate that: (1) public perception of the risk of arrest increased; (2) the percentage of drivers with illegal BAC levels decreased; and (3) alcohol related accidents, injuries and fatalities decreased.

It is important to note that traditional roving patrols searching for observably impaired drivers and sobriety checkpoints are not competing or mutually exclusive alternatives. To the contrary, the National Transportation Safety Board and other organizations urging the use of sobriety checkpoints emphasize that they are efficient and effective only when used in conjunction with existing efforts as part of a comprehensive program of education, deterrence, interdiction and sanction. [Emphasis original; footnotes omitted.]

*Id.* 519 A.2d at 990–991.

4. *Balancing Test.* As to the balancing test itself, the Kansas Supreme Court identified 13 factors to consider in determining whether a sobriety checkpoint is a reasonable accommodation of the public's interest in highway safety with the individual's right to travel freely without governmental intrusion. The court stated:

Numerous conditions and factors must be considered in determining whether a DUI roadblock meets the balancing test in favor of the state. Among the factors which should be considered are: (1) The degree of discretion, if any, left to the officer in the field; (2) the location designated for the roadblock; (3) the time and duration of the roadblock; (4) standards set by superior officers; (5) advance notice to the public at large; (6) advance warning to the individual approaching motorist; (7) maintenance of safety conditions; (8) degree of fear or anxiety generated by the mode of operation; (9) average length of time each motorist is detained; (10) physical factors surrounding the location, type and method of operation; (11) the availability of less intrusive methods for combating the problem;

(12) the degree of effectiveness of the procedure; and (13) any other relevant circumstances which might bear upon the test. Not all of the factors need to be favorable to the state but all which are applicable to a given roadblock should be considered. Some, of course, such as unbridled discretion of the officer in the field, would run afoul of *Prouse* regardless of other favorable factors.

*State v. Deskins*, 234 Kan. 529, 673 P.2d 1174, 1185 (1983).

From my review of the decisions in other jurisdictions upholding sobriety checkpoints or roadblocks as reasonable under the fourth amendment, I believe *Deskins* sets forth the most thorough statement of the factors to be considered in deciding whether a roadblock is reasonable. I thus turn to the roadblock at issue and examine the logistical and procedural facts using the *Deskins* factors.

The roadblock was well identified as a police checkpoint. Road signs, marked official vehicles with flashing overhead lights, and the presence of 21 uniformed officers warned approaching motorists of the police authority conducting the roadblock. Advance notice in the news media, including radio, television and newspaper coverage, of the date of the intended roadblock, had the virtue of reducing the public's fear, surprise, and inconvenience of the proposed police activity. Administrative officers planned the roadblock in advance, selecting the location, time and procedures pursuant to carefully formulated standards and neutral criteria. Selection of motor vehicles to be stopped was not arbitrary or random. Safety was assured by a well-lighted area, unobstructed view, and a wide roadway. Approaching motorists were timely informed of the nature of the impending intrusion by pamphlet and courteous introductory remarks by the police officers. Motorists who were not impaired were detained for as short a time as possible. The average motorist waited two minutes or less. The roadblock occurred in the early morning hours when traffic was lighter, and lasted two hours. The site was selected because it was the highest accident location where alcohol was involved in

1984, and the second highest in 1983 in the jurisdiction of Boise City.

The availability of less intrusive methods for combating the problem of drunk drivers was discussed by Justice Feldman in his concurring opinion in *State ex rel. Ekstrom v. Justice Ct. of State of Arizona*, 136 Ariz. 1, 663 P.2d 992 (1983):

... In a statement made before the United States Senate Subcommittee on Surface Transportation in 1982, the Deputy Administrator of the National Highway Traffic Safety Administration stated: "Over the past 10 years the number of persons killed on our highways in motor vehicle accidents involving alcohol has averaged 25,000 per year. In 1980, over 650,000 people were injured in accidents involving alcohol." *Federal Legislation to Combat Drunk Driving Including National Driver Register: Hearing on S.671, S.672, S.2158 Before the Subcomm. on Surface Transportation of the Senate Comm. on Commerce, Science & Transportation*, 97th Cong., 2nd Sess. 65 (1982). Between 40 and 55% of drivers who are fatally injured have alcohol concentrations in their blood above the legal limit and this figure rises to 55 to 65% in single-vehicle crashes. *Alcohol, Drugs & Driving: Hearing to Examine What Effect Alcohol & Drugs Have on Individuals While Driving Before the Subcomm. on Alcoholism & Drug Abuse of the Senate Comm. on Labor & Human Resources*, 97th Cong., 2nd Sess. 1 (1982). Furthermore, it has been estimated that one out of every 50 drivers on the road has a blood-alcohol content of .10 or higher; on Friday and Saturday nights, one out of 10 drivers is drunk. *Hearing Before the Subcomm. on Surface Transportation, supra* at 112. However, "only 1 of every 2,000 drinking drivers is caught daily, while 70 [people] are killed." *Id.* at 55. Many of those killed or injured are innocent victims of drunk drivers.... These statistics make it obvious that *traditional law enforcement methods, involving the arrest by roving officers of only those whom they can stop upon a*

*founded suspicion of drunk driving, fall short of satisfying society's compelling interest in enforcing compliance with the laws prohibiting drunk driving. This being so, more intrusive methods may be considered reasonable. See Delaware v. Prouse, 440 U.S. at 659, 99 S.Ct. at 1399. [Emphasis added; footnote omitted.]*

*Id.* 663 P.2d at 999–1000.

On balance, the highly important state interest in preventing alcohol-related automobile accidents and fatalities before they occur by deterring the drunk driver outweighs the minimal intrusion on an individual's right to freely travel upon a public roadway. The scales tip in favor of the public welfare, and hence justify the systematic, nondiscretionary and brief stop to check the sobriety of the driver. I therefore conclude that the DUI roadblock in this case passes constitutional scrutiny. The actions of the Boise Police Department were lawful, and it follows that the evidence obtained by the stop was admissible. The trial court did not err in denying the motion to suppress the evidence.

## II

Henderson poses the alternative argument—accepted by the Court in its lead opinion—that the legislature of the State of Idaho disapproves the DUI roadblock, as it has not statutorily permitted such roadblocks for the express purpose of checking sobriety. Henderson supports this argument by citing a statement included in a "Report of the Joint Subcommittee on DUI" regarding implied consent on the part of motor vehicle operators to an evidentiary test for the presence of alcohol or drugs, I.C. § 18–8002. The report states: "The committee has chosen to include probable cause to stop and request that the

exam be taken to discourage such practices as roadblocks which are strictly allowable only in certain situations as provided in I.C. § 19–621." [3] Idaho Senate Journal, Feb. 22, 1984, p. 94. I am not persuaded that this committee's statement, standing alone, signifies a legislative prohibition against DUI roadblocks.

Just this year, our legislature announced a position reflecting public policy toward the problem of intoxicated drivers, although not in the context of specifically addressing sobriety roadblocks. The legislature recently adopted a program for electronic monitoring of drivers who have received convictions or withheld judgments for violation of the DUI statutes, by allowing the driver—as a condition of probation—to operate a vehicle upon restricted driving privileges where the operator's vehicle is equipped with an "ignition interlock device." In its enactment, the legislature made an expression of intent. It said: "The legislature finds and declares: (1) There is a need to reduce the incidence of drivers on the highways and roads of this state who, because of their use or consumption of alcohol, pose a danger to the health and safety of other drivers; ...." 1988 Idaho Sess. Laws, ch. 339, § 1. The legislature's expressed concern is relevant to the instant case and should not be ignored.

I readily concede that the people of Idaho most often speak through their legislature on matters of public policy. Consequently, if the legislature were to adopt a statute prohibiting sobriety checkpoints, then such legislation would be a clear expression of public policy in Idaho. *Compare Commonwealth v. Tarbert*, 517 Pa. 277, 535 A.2d 1035 (Pa.1987). Absent such a declaration reflecting the will of the electorate,

---

**3.** I.C. § 19–621 provides:

*Authority to establish road blocks.*—The duly elected or appointed sheriffs, state policemen or policemen of cities of the first or second class of the state of Idaho are hereby authorized to establish, in their respective or adjacent jurisdictions, temporary road blocks upon the highways of this state or city streets for the purpose of apprehending persons reasonably believed by such officers to be want-

ed for violation of the laws of this state, of any other state, or of the United States, and using such highways or streets.

This statute, enacted in 1957, is directed toward the apprehension of persons "wanted" for law violations. It does not, by its terms, prohibit checkpoints for other legitimate purposes such as deterring intoxicated drivers from operating motor vehicles on public highways.

we are left with legislative silence in that regard—a rather unreliable indicator of legislative or popular opinion. Indeed, one reasonably may argue that the legislature would not feel obliged to enact specific legislation authorizing conduct it deemed to be constitutional and appropriately within the scope of the existing police power. *Ingersoll v. Palmer*, 43 Cal.3d 1321, 241 Cal. Rptr. 42, 743 P.2d 1299 (1987). Consequently, the only question in need of determination here is whether the roadblock in this case violated the federal and state constitutions. I am convinced it did not.

I am also not persuaded that the propriety and legality of the roadblock in this case turns on the existence of prior approval by the Legislature, as postulated by the majority's opinion. The sole question before us is whether a sobriety checkpoint is constitutionally permissible. If it is not, then any action by the Legislature with regard to sobriety roadblocks is superfluous. Legislative authorization does not *per se* render a police activity constitutional. To the contrary, such legislation itself may be unconstitutional. However, we are not called upon here to review the constitutionality of legislation; instead, we are presented only with a review—within the confines of the constitutions—of the police activity. As stated, I have concluded the roadblock conducted in the instant case is not violative of any pertinent constitutional provision.

The order refusing to suppress evidence, and Henderson's judgment of conviction for driving while under the influence, should be affirmed.

BAKES, J., concurs.