**The STATE of Oklahoma, Appellant,**

v.

**Terrance Lee SMITH, Appellee.**

No. S-82-189.

Court of Criminal Appeals of Oklahoma.

Jan. 6, 1984.

Robert H. Macy, Dist. Atty., Larry A. Jones, Asst. Dist. Atty., Dist. Number Seven, Oklahoma County, for appellant.

Ted A. Richardson, Oklahoma City, for appellee.

OPINION

BUSSEY, Presiding Judge:

The State has appealed on a reserved question of law from an order of the Honorable Creston B. Williamson, entered in Oklahoma County District Court, Case No. CRM-81-3994, sustaining the demurrer (more properly denominated a motion for a directed verdict) of the defendant, Terrance Lee Smith, and dismissing the charge of Operating a Motor Vehicle While Under the Influence of an Intoxicating Liquor. Judge Williamson's order was based upon, and incorporated, the earlier ruling of the Honorable Leonard G. Geb on the defendant's motion to suppress; said order providing in pertinent part as follows:

Simply stated, the facts are as follows. The defendant was stopped at a roadblock located on MacArthur Boulevard, just north of N.W. 10th Street in Oklahoma City. The roadblock was part of a joint effort by the Oklahoma Department of Public Safety, the Oklahoma Highway Patrol, the Oklahoma City Police Department, and the Oklahoma County Sheriff's Office. The respective representatives of these agencies maintained at the hearing that the purpose of this roadblock, and five others that particular night, was to identify and remove from the highways violators of Oklahoma driver license and car registration provisions. The six roadblocks were part of a one-night blitz

by the above-referenced state agencies. The defendant, it is stipulated, was stopped at such a roadblock, as were all other motorists passing through, without probable cause or without a reasonable, articulable suspicion giving rise to the stop. Thereafter, evidence of the defendant's alleged intoxicated status was obtained. It should be noted that the state agencies would either stop all cars, or would stop cars on the basis of an established interval, e.g., every third car. If traffic would back up, several cars would be allowed to pass without being stopped.

\* \* \* \* \* \*

In applying the decisions of the United States Supreme Court to the present case, the Court is faced with an inquiry as to (1) the type of checkpoint involved, (2) the purpose of the checkpoint, and (3) the degree of intrusion and fright endured by the individuals passing through the checkpoints. First, the checkpoints used by the state agencies in the present case would be classified as 'temporary checkpoints.' The roadblocks were in fixed locations for a set period of time. They were then moved to additional fixed locations. Additionally, these checkpoints were not regularly established, e.g., daily, weekly, monthly, etc. They were part of a one-night affair. These roadblocks were in no way the type of permanent checkpoint approved for a limited purpose in *United States v. Martinez-Fuerte,* 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

Second, the evidence regarding the purpose of the roadblocks is somewhat conflicting. Witnesses representing the state agencies maintained throughout the evidentiary hearing that the primary purpose of the roadblocks was to check for drivers driving without a license. However, there exists substantial evidence to the contrary. The evidence, when taken as a whole, leads this Court to the conclusion that the primary purpose of the checkpoints was to seek out DUI offenders. Indeed, the evidence is almost overwhelming.

The checkpoints were established in three different locations during two different time periods. Both time periods were during the late night hours of October 2, 1981, and the early morning hours of October 3, 1981. Specifically, the first set of roadblocks were in force from 9:30 p.m. until 11:00 p.m.; the second was from 12:15 p.m. through 1:30 a.m. This was a Friday night-Saturday morning time period.

The checkpoints were manned by teams of ten officers each, with supervisory personnel also present at every site. Additionally, the agencies had on the sites mobile vans for booking and jailing offenders, blood testing equipment, breatholizer equipment, trained phlebotomists to administer blood tests, and mobile jail units to transport offenders. Also, arrangements had previously been made with several wrecker companies to stand by in view of the likely arrests to be made. This is especially interesting in light of Lt. Gerald Spencer's testimony that no person would have been arrested for driver license or car registration violations. Furthermore, the evidence showed that the checkpoints were located in areas sporting several drinking establishments.

The evidence further showed that the roadblocks were the first in Oklahoma County within the past ten to eleven years for the supposed purpose of checking driver licenses and car registrations. These roadblocks were preceded on the night in question with a meeting of the officers, supervisors, two Assistant District Attorneys, and the District Attorney himself. In fact, the District Attorney was also present at the roadblock sites. It is interesting to note that in establishing the sites for the roadblocks, Captain Michael LaPuzza, who planned the operation, did not even consult statistics available to him regarding high traffic areas.

What is truly telling about the actual purpose of these roadblocks are the various statements made by agency officers and the media play generated by the agencies during the days preceding October 2, 1981. Captain LaPuzza acknowledged on cross-examination that he planned the operation to get drunk drivers off the roads. Lt. Spenc-

er also made statements to the press regarding the need to get the drinking driver off the street. He made no equivalent statement regarding unlicensed drivers.

Moreover, the agencies let it be known to their troop headquarters and to the media that the purpose of this 'strike force' was to join in a 'crusade that will seek out the drinking driver....' The title of the news release issued by the Oklahoma Department of Public Safety and dated September 30, 1981, is 'Drinking Drivers Beware.'

Upon review of all the evidence, it is clear that the purpose of these roadblocks was to seek out DUI offenders and nothing else. It is highly unlikely that the State would go to such great trouble during the wee hours of the morning and personally involve the District Attorney in order to check driver licenses. Nor is it likely that the State would involve such technical personnel and equipment in order to check driver licenses. Most especially, the statements made by agency officials to the public lead to the conclusion that these roadblocks were not for the purpose of investigating license and registration violations. The Court finds, as a matter of fact, that these roadblocks were established for the primary purpose of seeking criminals, i.e., DUI offenders.

Third, the Court must consider the degree of intrusion and fear that an individual would be subjected to when passing through such roadblocks. The Court notes that an intrusion is not necessarily the time involved in making a stop and asking a few questions. The subjective intrusion is also the fear thrust upon an individual by governmental authority. *United States v. Martinez-Fuerte,* supra. In the present case, the limited fright factor heavily relied upon by the United States Supreme Court in *Martinez-Fuerte* is potentially much greater here. The Court in *Martinez-Fuerte* emphasized that the checkpoints were permanent; they were regular; they were within the everyday knowledge of the community. Therefore, the Court reasoned, the individuals in the community would not be surprised and fearful of a known road-block. The roadblocks in the present case could well act, and most likely did act, as a total surprise to those passing through. The fear factor involved in this case is heightened by the presence of at least ten officers, chemical testing equipment, and mobile booking and jail vans actually on the scene. To the individual approaching such a roadblock, it is not unlikely that he would reasonably perceive the officers as being desirous of arresting criminals and that anyone passing through could easily be arrested. The United States Supreme Court has never stretched its permanent road-block exception to the point that such an intrusion can be tolerated under the Fourth Amendment. The subjective, intrusion, i.e., fear and apprehension, potentially imposed upon the individual innocent of misconduct is simply too great.

The Court finds such activities by law enforcement authorities, while commendable in their ultimate goal of removing DUI offenders from the public highways, draw dangerously close to what may be referred to as a police state. Here, the state agencies have ignored the presumption of innocence, assuming that criminal conduct must be occurring on the roads and highways, and have taken an 'end justifies the means' approach. The Court is not so naive to think that criminal conduct does not occur regularly in the form of DUI offenders. Yet, a basic tenet of American jurisprudence is that the government cannot assume criminal conduct in effectuating a stop such as the one presented herein. Were the authorities allowed to maintain such activities as presented in this case, the next logical step would be to allow similar stops for searching out other types of criminal offenders. For example, it is well known to the public that shoplifting is an everyday occurrence which constantly plagues merchants in Oklahoma and elsewhere. Are law enforcement authorities then to be allowed to establish fixed checkpoints, permanent or otherwise, outside of every shopping center in the area to question all exiting shoppers as to whether they possess sales receipts? Are law enforcement authorities to be allowed to demand

all shoppers to produce such receipts or be subject to arrest everytime they go shopping? The potential for abuse is apparent.

The critical distinctions between the present case and *Martinez-Fuerte* lie in the purpose of the stop and the subjective intrusion, i.e., the fear of apprehension factor, upon the individual. The stop in *Martinez-Fuerte* was not so much to seek out criminals as it was to enforce immigration laws and see to it that those having no right to be in this country be deported. Moreover, those stops were at a permanent checkpoint and were 'regular' so as to reduce the fear factor upon the local community. The stops in *Martinez-Fuerte* were for a limited purpose, and the community was well aware of that purpose. In the present case, however, the purpose of the stops were totally different. The state agencies were seeking criminals assumed to be on the public roads. There is a vast difference in enforcing immigration laws and affirmatively seeking out criminals in the manner done so here. Most importantly, the element of fright is potentially much greater here. The Fourth Amendment does not permit such intrusions.

The Court holds that the Fourth Amendment protection against an unreasonable seizure of the person is violated by the use of a temporary roadblock as a means to stop all traffic (or traffic at established intervals) without any articulable facts giving rise to a reasonable suspicion for the stop, for the purpose of seeking out criminal DUI offenders. It is, therefore, the order of the Court that the defendant's Motion to Suppress be SUSTAINED.

Having thoroughly reviewed the record and the arguments set forth in the briefs before us, we are convinced that Judge Geb's order constituted an accurate assessment of the facts surrounding the event in question and a proper application of the controlling case law to those facts. See, *Delaware v. Prouse,* 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979); *United States v. Martinez-Fuerte,* supra; *United States v. Brignoni-Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); *United States v. Ortiz,* 422 U.S. 891, 95 S.Ct. 2585, 45 L.Ed.2d 623 (1975); *Almeida-Sanchez v. United States,* 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973).[1] Accordingly, Judge Williamson properly sustained the appellant's demurrer to the evidence on the basis of Judge Geb's order, at the appellant's trial.

We are furthermore not persuaded to adopt the alternate theory proffered by the State, which theory would sanction the stops on the basis of its police power to provide for the public safety and welfare. The State argues that, if routine and reasonable driver's license checks are permitted to ensure the safety of the citizens of Oklahoma, then roadblocks designed solely to discover and apprehend intoxicated drivers are likewise a legitimate exercise of its power. While we do not categorically reject this argument, we would note that the State's power to conduct routine and reasonable driver's license checks is grounded in 47 O.S.1981, § 6–112. See, *Brantley v. State,* 548 P.2d 675 (Okl.Cr.1976); *Edwards v. State,* 319 P.2d 1021 (Okl.Cr.1957). We find no statutory authority which would support, directly or indirectly, the State's contention that it has the power to establish checkpoints to inspect all motorists to discern if any are intoxicated.

The action taken by the district court is AFFIRMED, and the State's appeal hereby DISMISSED.

CORNISH, and BRETT, JJ., concur.

---

1. Cases involving police action similar to the present have recently arisen in other states. See, *Commonwealth v. McGeoghegan,* 389 Mass. 137, 449 N.E.2d 349 (1983); and *State ex rel. Ekstrom v. Justice Court of State of Arizona,* 136 Ariz. 1, 663 P.2d 992 (1983). In *McGeoghegan,* the Massachusetts Supreme Judicial Court held the roadblock unconstitutional because there was no showing of sufficient police presence at the roadblock, and because of inadequate lighting and warning to oncoming motorists. The Arizona Supreme Court held in *ex rel. Ekstrom* that the police officers conducting the roadblock were given insufficient guidelines to govern the scope and nature of their actions; hence they were afforded an unconstitutional amount of discretion.