[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION ON MOTION TO DISMISS, MOTION TO SUPPRESS ANDMOTIONS HEARING, FEBRUARY 24, 1995
On June 16, 1994, the State of Connecticut charged the defendant, with violating General Statutes, Sec. 14-227a(a), for operating a motor vehicle in New Fairfield, on June 4, 1994, while under the influence of intoxicating liquor. The defendant entered a not guilty plea to the charge.
The State Police stopped the defendant, in New Fairfield, as a result of a DWI checkpoint.[1] Thereafter, the police conducted sobriety tests and the defendant supplied an evidentiary sample of his breath which revealed a concentration of .16 percent, greater than the "legal limit" of .10 percent. On July 6, 1994, after an administrative hearing pursuant to General Statutes, Sec.14-227b(f) and (g), the Commissioner of Motor Vehicles suspended the defendant's operating privileges for ninety (90) days. In the administrative hearing, the commissioner found that the police had probable cause to arrest the defendant, that the results of the chemical breath test exceeded .10 percent and that the defendant was the driver of the vehicle. The defendant has served his ninety (90) day suspension.
On July 29, 1994, pursuant to Practice Book, Secs. 820 and 821, the defendant filed a motion to suppress the results of the stop, CT Page 4860 arguing that "the initial stop at a DWI spot check and the arrest following said stop were made in violation of the defendant's rights under the Fourth Amendment to the United States Constitution and Article I, Section 7 of the Connecticut Constitution. This motion is made on the grounds that the stop was an unreasonable seizure under the Federal and State Constitutions and that the evidence seized should therefore be suppressed." On January 17, 1995, the defendant filed a brief in support of his motion to suppress. On the same date, the State filed its memorandum in opposition to the motion to suppress arguing that the procedures actually followed by the officers comported with constitutional requirements. The court conducted an evidentiary hearing on the motion to suppress on December 13 and December 15, 1994, and oral argument on the motions was heard on February 24, 1995.
On October 26, 1994, pursuant to Practice Book, Sec. 815(6), the defendant filed a motion to dismiss the charge filed against him, arguing that the administrative suspension "and this prosecution constitute `separate proceedings' and the 90 day suspension resulting from the July 6 hearing constitutes `punishment' which triggers the protection of the Double Jeopardy Clause." On January 17, 1995, the defendant filed a memorandum in support of his motion to dismiss. On the same date, the State filed its memorandum in opposition to the defendant motion, arguing that the administrative suspension is not a penalty, and, as a result, double jeopardy does not attach in this case. The following evidence was adduced at the December 13 and December 15, 1994 evidentiary hearings on the motions to suppress and dismiss.
On June 4, 1994, the defendant was traveling north on Route 37 from Danbury into New Fairfield. Between Saw Mill Road and Colonial Road, the Connecticut State Police, in conjunction with the New Fairfield Police Department, had set up a DWI checkpoint for the purposes of detecting operators under the influence of alcohol and/or drugs, license and registration violations and emissions violations. The checkpoint began at 9:00 p.m. on June 3 and continued until 3:00 a.m. on June 4, 1994. At 12:08 a.m. the defendant was arrested.
In order for a checkpoint to be conducted, advance approval is required. A request must be made to and approved by a master sergeant of the Connecticut State Police, then approved by the captain in charge. In the present case, the request was made by New Fairfield's resident trooper, Trooper Dielemans. Robert Gawe, CT Page 4861 the sergeant in command at the checkpoint testified that Dielemans "went to the master sergeant of Troop A, who was at that time acting as a CO, and asked them if they could hold a spot check for DUI in the town of New Fairfield and he called out the location based on the fact that there were prior arrests in that general area and it is a well traveled road from the bars in the Danbury area into the residential area of New Fairfield."
"The master sergeant reviewed that request and approved it, and he then went to the captain, who was the executive officer of the western district of the state police, and asked his opinion and his permission to run that spot check, and the captain gave his permission to operate that particular spot check."
After approval is received, there are two documents, in addition to the United States and Connecticut constitutions, that guide the conduct of the officers at the checkpoint. TheAdministration and Operations Manual ("AO"), State's Exhibit 2, is the general directive that dictates general procedures, and the Operational Plan for Spot Check, State's Exhibit 1, dictates the more specific procedures. As Gawe testified, the AO "calls out what must be done, what are the procedures which must be followed, and subservient to that is [the Operational Plan,] a procedural guide for Troop A in Southbury, which calls out what must be done relative to our particular area of jurisdiction." (Emphasis added.)
State's Exhibit 1 indicates that the location of the spot check was determined by the fact that it "[h]as been used in the past and resulted in the apprehension of violators"; "[h]as been or is near the location of frequent accidents"; and "[i]s along the route travelled by potential violators." There was no testimony adduced during the hearing with respect to the accident criteria. In fact, Sergeant Gawe testified that Trooper Dielemans "called out the location based on the fact that there were prior arrests in that general area and it is a well traveled road from the bars in the Danbury area into the residential area of New Fairfield." No testimony supported the fact that Trooper Dielemans "called out" the location based on the accident history of the area.
State's Exhibit 2, the AO, has an attached memorandum from the executive officer of Troop A, M/SGT James Turner, that reads:
"SUBJECT: DWI Spot Checks." CT Page 4862
 When conducting DWI spot checks the following criteria must be adhered to.
1. Prior approval of spot check by C.O. or M/SGT.
 2. News release announcing spot checks at least 3 days prior to check.
 3. A properly planned operation which is executed according to plan.
a. Use Troop A operational plan.
4. Supervisor must be present throughout spot check.
 5. A sketch map of spot check set-up must be submitted with completed plan to C.O. after each spot check.
 6. Refer to AO manual section 16.1.6 for spot checks. [Emphasis added.]
To comply with constitutional limits on trooper discretion and to preserve the integrity of DWI checkpoints, AO, section 16.1.6(b) was promulgated. This section states, in pertinent part:
b. Spot checks must be properly conducted and supervised.
 (1) Because spot checks involve stopping motorists in the absence of probable cause or particularized suspicion, their conduct has been subject of controversy.
 (2) Although a few exceptions exist, most courts have held that properly designed and operated spot checks offend neither the federal nor state constitution.
(3) Procedure
 To conform with requirements imposed by judicial constraints, the following procedure will be used:
. . . .
 (c) To minimize fear or apprehension approaching motorists are likely to encounter during a spot check and CT Page 4863 to provide for the safety of all concerned:
 1. Notice of a spot check or series of spot checks shall be provided to public media organizations covering the area of the spot check at least three (3) days in advance.
 2. The notice need not contain exact hours of operation or an exact location, but should contain the name of the town(s) involved and a general statement regarding what period of the day or night it will be conducted.
. . . .
 4. Upon first contact with a vehicle operator, troopers shall reassure the operator that this is a routine traffic operation.
. . . .
 (4) To ensure fair, impartial and uniform treatment of motorists and to place limits upon trooper discretion, the supervisor or superior approving the plan shall ensure that:
. . . .
 (d) Each motorist is treated in the same manner at the initial stop, i.e., is greeted in the same way, asked the same initial questions and are asked to produce the same documents and each stopped vehicle should receive the same examination.
 (5) A supervisor, of the rank of sergeant or above, shall be present at each spot check site to ensure that:
 (a) Participating personnel are familiar with the plan and;
(b) The plan is followed. CT Page 4864
The operational plan in force this particular night indicated that Gawe would be in charge and that four state troopers and three officers of the New Fairfield force would be assigned to the checkpoint. Pursuant to the plan, all vehicles would be stopped and the stoppage would be terminated if more than twenty vehicles were backed up. In an effort to minimize the apprehension and fear of oncoming traffic, the interrogation area was defined by artificial lighting, uniformed police, marked cruisers, signs and traffic cones. The plan required that upon stopping a vehicle and interviewing the operator, if the police detected that further investigation was necessary, they would remove the operator and vehicle to the parking lot of the pizza shop adjacent to the highway for further questioning.
On the afternoon of June 4, 1994, the officers and troopers gathered for a briefing regarding the New Fairfield checkpoint. The briefing focused on the need for limited discretion on the part of the officers and troopers in conducting the checkpoint. Also discussed was the need to limit the fear and apprehension of oncoming drivers through the use of lighting, cones, signs and uniformed police. There were no discussions about what particular questions the police would ask. Sergeant Gawe instructed the police that they could ask the drivers whatever questions they felt comfortable with, as long as they asked the same questions of each operator they individually stopped. The only limitation on the discretion of the police was that the questions they could ask must be brief. There was one sergeant, four troopers and three officers of the New Fairfield force executing the checkpoint operation that night so, presumably, eight separate and distinct interrogation methods were employed.
During the conduct of the checkpoint, despite the admonitions contained in the AO and the operational plan not to vary from the mandates of those two documents, the troopers and officers failed to follow the written plans. The State failed to offer evidence that media publication of the checkpoint at least three days prior to the operation ever occurred or that a press release was even issued to the Danbury News-Times or WLAD 800.[2] This failure violates AO sections 16.1.6(b)(3)(c)(1) and (2).
The police also failed to ask the same questions to each motorist that proceeded through the checkpoint as required by AO, Sec. 16.1.6(b)(4)(d). Sergeant Gawe testified that during the two minute stop he would ask each operator to recite the alphabet "because [he'd] never seen a drunk get through it." CT Page 4865 Trooper Wade asked the operators where they were coming from and had they been drinking. Other troopers and officers would ask, inter alia, "Where are you coming from?" "Have you been drinking, and where?" Trooper Wade, when asked why he did not employ the alphabet method, stated "I mean, if you're not thinking of the alphabet or discussing it and all of a sudden you are put in that position, it's — I think it would be hard for even you know, anybody who is used to A through Z. But I don't do that, sir."
Sergeant Gawe was cross examined as to why all officers were not required to ask the same questions as mandated by the plain and unambiguous language of AO, Sec. 16.1.6(b)(4)(d). His response was that he interpreted the regulations to require each individual officer to ask each operator that that particular officer interviewed the same set of questions, rather than to treating all individuals the same way by requiring all officers to ask all motorists the same initial set of questions. Further, he stated, in support of his interpretation, that "it's not fair to the officer to give them a specific question to ask because they may very well forget that and revert back to what they normally do."
Based on these facts, the defendant argues that the conduct of the June 4, 1994 checkpoint in New Fairfield violated his constitutional right to be free from unreasonable searches and seizures guaranteed by the fourth amendment to the United States constitution and article 1, section 7 of the Connecticut constitution.
The State argues in response that despite the failure of the police to follow the AO guidelines with regard to the notice and interrogation issues, their transgressions do not rise to the level of a constitutional violation.
Motion to Suppress
The parties agreed at oral argument on this matter that the State has the burden of proof, on the motion to suppress, of sustaining the constitutionality of the DWI checkpoint. See Statev. Roseboro, Superior Court, Judicial District of Ansonia/Milford at Milford, Docket No. 81771 (October 4, 1990, Fuller, J.), aff'd, 221 Conn. 430, 604 A.2d 1286 (1992) (state has burden of proof on motion to suppress evidence); see also Commonwealth v.Donnelly, 34 Mass. App. 953, 953, 614 N.E.2d 1018, 1019 (1993) (state has burden of proof in constitutional challenge to DWI CT Page 4866 checkpoint); see also 4 W. LaFave, Search and Seizure, Sec. 11.2(b), p. 218 (2d Ed. 1987) ("if the search or seizure was pursuant to a warrant, the defendant has the burden of proof; but if the police acted without a warrant the burden of proof is on the prosecution"). Further, there is no dispute that stopping the defendant's motor vehicle at the checkpoint was a seizure under the federal; Michigan State Police v. Sitz, 496 U.S. 444, 450,110 S.Ct. 2481, 110 L.Ed.2d 412 (1990); and Connecticut constitutions. See State v. Lamme, 216 Conn. 172, 174-76,579 A.2d 484 (1990). Therefore, the principal issue before the court is whether the seizure of the defendant was unreasonable under thefourth amendment[3] of the federal constitution and article 1, section 7 of the Connecticut constitution.[4]
"It is a cardinal principle that `searches [and seizures] conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under thefourth amendment — subject only to a few specifically established and well-delineated exceptions.'" United States v. Ross, 456 U.S. 798,825, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), quoting Katz v.United States, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576
(1967). One of these deviations from the warrant requirement is the "automobile exception," where probable cause that criminal mischief is afoot is necessary to search, but due to the movability of an automobile and the exigence associated therewith, a warrant is unnecessary. See California v. Carney,471 U.S. 386, 394, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985).
In Terry v. Ohio, 392 U.S. 1, 20-22, 88 S.Ct. 1868,20 L.Ed.2d 889 (1968), the Supreme Court, applying a practicality test, held that where "swift action predicated upon the on-the-spot observations of the officer on the beat" was required, the probable cause requirement could be diluted to a "reasonable and articulable suspicion" standard. See State v. Lamme, supra,216 Conn. 176.
In Michigan State Police v. Sitz, supra, 496 U.S. 450, 455, the United States Supreme Court upheld the constitutionality of the "use of [DWI] sobriety checkpoints generally." In so doing, the Supreme Court reduced the probable cause requirement to a no cause requirement. Many courts have considered this evisceration of the reasonable suspicion standard a "sui generis" interpretation of the fourth amendment. See, e.g., Commonwealthv. Anderson, 406 Mass. 343, 347, 547 N.E.2d 1134, 1136 (1989). Some courts have refused, on state constitutional grounds, to CT Page 4867 give the checkpoint exception to the warrant requirement this liberal interpretation. See Sitz v. Department of State Police,443 Mich. 744, 778-79, 506 N.W.2d 209, 224-25 (1993) (holding DWI checkpoints unconstitutional under the Michigan constitution after remand by the United States Supreme Court); Pimental v.Department of Transportation, 561 A.2d 1348, 1355 (R.I. 1989) (holding DWI checkpoints unconstitutional under the Rhode Island constitution); City of Seattle v. Mesiani, 110 Wash.2d 454,456-57, 755 P.2d 775, 776-77 (1988) (holding DWI checkpoints unconstitutional under the Washington constitution absent some individualized suspicion); State v. Henderson, 756 P.2d 1057,1063 (Idaho 1988) (holding DWI checkpoints unconstitutional under the Idaho constitution absent legislative and judicial approval);State v. Boyanovsky, 304 Or. 131, 133-34, 743 P.2d 711, 712
(1987) (holding DWI checkpoints unconstitutional under the Oregon constitution absent some individualized suspicion); State v.Smith, 674 P.2d 562, 564-65 (Okla.Ct.App. 1984) (holding DWI checkpoints unconstitutional under the Oklahoma constitution absent some individualized suspicion).[5]
In upholding the constitutionality of the checkpoint, theSitz court employed the three prong balancing test of Brown v.Texas, 443 U.S. 47, 51, 99 S.Ct. 2637, 61 L.Ed.2d 357 (1979).Michigan State Police v. Sitz, supra, 496 U.S. 450. The Brown
balancing test requires an examination of the gravity of harm sought to be avoided by the seizure, the degree to which the public interest is advanced by the seizure — the effectiveness prong and the degree of interference with the defendant's individual liberty — the objective and subjective intrusion prong.Brown v. Texas, supra, 443 U.S. 51.
With respect to the harm sought to be avoided, a lengthy discussion of the carnage brought to bear on society by intoxicated drivers is unnecessary. See Michigan State Police v.Sitz, supra, 496 U.S. 451 ("[n]o one can seriously dispute the magnitude of the drunken driving problem or the States' interest in eradicating it"); State v. Harrison, 228 Conn. 758, 765,638 A.2d 601 (1994) (discussing eradication of "the carnage associated with drunk drivers"); Savapolos v. Connecticut,8 Conn. L. Rptr. 187, 190 (January 5, 1993, Pickett, J.) (citing cases discussing the carnage).
The second factor, the degree to which the seizure advances the public interest, examines the effectiveness of the checkpoint. Brown v. Texas, supra, 443 U.S. 51. "This passage CT Page 4868 from Brown, [discussing the effectiveness factor,] was not meant to transfer from politically accountable officials to the courts the decision as to which among reasonable alternative law enforcement techniques should be employed to deal with a serious public danger. Experts in police science might disagree over which of several methods of apprehending drunken drivers is preferable as an ideal. But, for the purposes of Fourth Amendment analysis, the choice among such reasonable alternatives remains with the governmental officials who have a unique understanding of, and a responsibility for, limited public resources, including a finite number of police officers." Michigan State Police v.Sitz, supra, 496 U.S. 453-54.
In the present case, there was no evidence provided by the State that any of the procedures crafted for the regulation of checkpoints were created with any input from politically accountable government officials. In fact, Sergeant Gawe testified that he did not know who created the AO guidelines. Compare Michigan State Police v. Sitz, supra, 496 U.S. 447 (the director of the state police "appointed a Sobriety Checkpoint Advisory Committee comprising representatives of the State Police force, local police forces, state prosecutors, and the University of Michigan Transportation Research Institute. Pursuant to its charge, the advisory committee created guidelines setting forth procedures governing checkpoint operations, site selection, and publicity").
The State did elicit testimony with respect to the actual effectiveness of this checkpoint, that three of the roughly 200 drivers stopped were arrested for DWI.[6] Sergeant Gawe testified that in his opinion, three arrests in one night in New Fairfield is greater than the normal incidence of DWI stops there. He was unable to testify, however, as to what the normal incidence of DWI stops was based on roving patrols.
Further, with respect to the selection of the location of the checkpoint, State's Exhibit 1 indicates that the site was determined based on the fact that the location had been used in the past and resulted in the apprehension of violators, that it was near the scene of frequent accidents and it was along a route traveled by potential violators. At the hearing, the State elicited testimony as to the fact that DWI arrests had occurred in the past in that general area and that the location was a point between the bars in Danbury and the residential community of New Fairfield. No testimony was elicited that indicated there CT Page 4869 were any accidents at this location. Further, there was no testimony that this particular location, as opposed to any other, had a higher frequency of DWI arrests. Based on the testimony and evidence in the case, and its observation of the checkpoint site, it appears to the court that the reasons for employing the location of this checkpoint were twofold: first, the fact that it is a fairly safe location for halting traffic, i.e., Route 37 at that location is a straightaway and there is a parking lot available for stoppage and interrogation of suspected violators; secondly, Route 37 is one of two main roads between New Fairfield and Danbury where arrests have occurred in the past.
"The third factor noted in Brown v. Texas, supra, concerns the severity of the interference with individual liberty." Statev. Boisvert, Superior Court, Judicial District of Waterbury, Docket No. 32 86 18, at 8 (May 31, 1994, Keller, J.). This factor requires the consideration of the objective and subjective intrusions on personal liberty as a result of the checkpoint.Michigan State Police v. Sitz, supra, 496 U.S. 451-52. In Sitz
the court found that the "objective intrusion" on motorists was relatively slight, "measured by the duration of the seizure and the intensity of the investigation. . . ."[7] Id., 452.
With respect to the "subjective intrusion," the court looked at a number of factors. On the first page of the opinion the Supreme Court identified the importance of appropriate "guidelines setting forth procedures governing checkpoint operations, site selection, and publicity." Id., 447. The court continued by agreeing with the lower court "that the guidelines governing checkpoint operation minimize the discretion of the officers on the scene." Id., 452. Further, they stated that the considerations relevant to the "fear and surprise" component of the subjective intrusions "are not the natural fear of one who has been drinking over the prospect of being stopped at a sobriety checkpoint but, rather, the fear and surprise engendered in law-abiding motorists by the nature of the stop." Id. The court, in generally declaring checkpoints to be constitutional, considered that the subjective intrusion was minimal when compared to a roving patrol because "checkpoints are selected pursuant to the guidelines, and uniformed police officers stop every approaching vehicle." Id., 453.
In the present case, the guidelines in place are designed to minimize fear and surprise, thereby lessening the subjective intrusion, if they are followed. In this regard, the Sitz case is CT Page 4870 inapposite except insofar as the Supreme Court continually identified the importance of maintaining neutral, discretion curtailing guidelines. The Sitz court did not, however, address the constitutional necessity of following the internal guidelines since Sitz was a civil declaratory judgment action brought by the "[p]laintiffs [who] are licensed drivers of the State of Michigan who regularly travel through the state in their automobiles."Sitz v. Department of State Police, supra, 429 N.W.2d 181;Michigan State Police v. Sitz, supra, 496 U.S. 448. The complaining parties in Sitz never had the privilege of proceeding through a checkpoint to observe the practical application of the guidelines and never maintained the status of criminal defendants.
In State v. Boisvert, supra, 9, the court stated that "[m]any other states have addressed the constitutionality of sobriety checkpoints under both federal and state constitutional law. Most have upheld the constitutionality of sobriety checkpoints so long as they are carried out pursuant to standards or guidelinesembodying explicit neutral limitations on the conduct ofindividual officers." (Emphasis added.) In Boisvert, the police appear to have followed the guidelines, specifically, AO, Sec. 16.1.6, at issue in this case. The officers issued a press release to the Waterbury Republican American and the Hartford Courant, although "no evidence was introduced to prove that publication did in fact occur prior to September 10, 1993." Id., 5. The court held, with respect to this issue, that "[a]dvance publication is . . . usually desired, but not considered constitutionally necessary." Id., 10; see also People v. Banks,6 Cal.4th 926, 948-49, 863 P.2d 769, 782 (1993) ("[i]n light of the United States Supreme Court's decision in Michigan State Policev. Sitz, supra, and consistent with the weight of authority examined above, we conclude that the operation of a sobriety checkpoint conducted in the absence of advance publicity, butotherwise in conformance with the guidelines . . . does not result in an unreasonable seizure within the meaning of thefourth amendment to the United States Constitution"). (Emphasis added.)
In Boisvert, supra, 9, the authorities, in providing the notice to the media, complied with their internal guidelines. See AO, Sec. 16.1.6(b)(3)(c)(1) ("[n]otice of a spot check or series of spot checks shall be provided to public media organizations covering the area of the spot check at least three (3) days in advance"). The defendant objected because the state failed to CT Page 4871 adduce evidence that the notice was ever published in the media. In the present case, in contrast, the State failed to prove that it ever supplied the notice to the media, as required by AO, Secs. 16.1.6(b)(3)(c)(1) and (2).
In State v. McGhee, Superior Court, Geographical Area 18 at Winsted, Docket No. 48746, at 11 (November 20, 1985, Maloney, J.), the evidence established that "[p]rior to conducting the roadblocks, the state and local police called a press conference and announced the dates when they would be conducting the roadblocks in Torrington. The news received full coverage in two newspapers of general circulation in the area and was broadcast six or seven times over a 24 hour period over a local radio station. The purpose of this publicity was to reduce fear andapprehension in the community" (emphasis added); as well as providing a deterrent effect. See State v. Koppel, 499 A.2d 977,982 (N.H. 1985), quoting People v. Scott, 63 N.Y.2d 518, 526-27,473 N.E.2d 1, 4 (1984) ("it is publicity about roadblocks that is the chief means of deterring driving while intoxicated"). (Emphasis in original.)
Both the Connecticut cases and the cases from other jurisdictions stand for the proposition that in judging the subjective intrusion of the stop, publicity is an important part of allaying the fear and apprehension associated with DWI checkpoints, ensuring the deterrent value of the operation and maintaining the constitutionality of the checkpoint, wherein violators are seized without any particularized suspicion or probable cause to believe that criminal activity is afoot.
In addition to violating the media publication requirements of AO, Sec. 16.1.6, the police in this case also failed to follow the unambiguous requirements of section 16.1.6(b)(4)(d), which states that "[e]ach motorist is treated in the same manner at the initial stop, i.e., is greeted in the same way, asked the same initial questions and are asked to produce the same documents and each stopped vehicle should receive the sameexamination." (Emphasis added.) This section was included in the guidelines "[t]o ensure fair, impartial and uniform treatment of motorists and to place limits upon trooper discretion." Id., Sec. 16.1.6(b)(4).
In this case, each motorist was not asked the same questions. Each police officer was encouraged by Sergeant Gawe at the operation briefing to ask his or her own set of questions. The CT Page 4872 only limit on the officer's discretion was to keep it short. While Sergeant Gawe's rationale may have been based on practical reasons arising from his experience, the fact remains that the guidelines are specific as to the examination requirement. Based on this fact, at the checkpoint in question, eight distinct and different methods of two minute interrogation were employed by the police. Trooper Wade even testified that the method employed by Sergeant Gawe, the recitation of the alphabet, was "hard" to comply with.
Further, AO, Sec. 16.1.6(b) requires strict compliance with its mandates, "b. Spot checks mustbe properly conducted and supervised." Section 16.1.6(b)(2) further states that "[a]lthough a few exceptions exist, most courts have held that properly designed and operated spot checks offend neither the federal nor state constitution.""Procedure. To conform with requirements imposed by judicial constraints, the following procedure will be used:. . . . (c) [requiring publication]. . . . (4) [requiring identical treatment]. . . . (5) A supervisor, of the rank of sergeant or above, shall be present at each spot check site toensure that:. . . . (b) The plan is followed." (Emphasis added.)
Moreover, the transmittal memorandum from Master Sergeant James Turner, the Executive Officer of Troop A in Southbury, attached to Exhibit 2, indicates that "[w]hen conducting DWI spot checks the following criteria must be adhered to. . . . 2. News release announcing spot checks at least 3 days prior to check. 3. A properly planned operation which is executed according to plan. . . . 6. Refer to AO manual section 16.1.6 for spot checks."
In Commonwealth v. Anderson, supra, the Supreme Judicial Court of Massachusetts addressed the constitutionality of a checkpoint in which the officers strayed from their guidelines. In that case, the officers extended the roadblock beyond the 2 a.m. curfew contained in their operational plan. Id., 344,547 N.E.2d 1134. At 2:15 a.m., Mr. Anderson was arrested and later charged with DWI. Id. In affirming the trial court's motion to suppress the evidence obtained from the roadblock, the court stated that "[o]nce the Department of Public Safety and the State police have adopted such standard, written guidelines for the conduct of roadblocks, which have been accepted as a sufficient substitute for the usual fourth amendment `reasonableness' demands, it follows that the Commonwealth must carefully comply CT Page 4873 with them. In order that the privacy interests of the motoring public under the fourth amendment and art. 14 [of the Massachusetts Constitution] be given fair weight in the unique balance that has been struck in favor of roadblock stops without individualized suspicion, it is imperative that the Commonwealth follow its own rules for meeting what the court has recognized as a sui generis interpretation of the reasonableness requirement. We note that roadblock guidelines purport to hold law enforcement officers to a standard of strict compliance." Id., 348-49, 547 N.E.2d 1137; see also Brown v. Commonwealth, supra, at *2 (guidelines mandated strict compliance).
In Anderson the State argued that all the federal and state constitutions required was "substantial compliance." The court rejected this argument, writing that "[a]dherence to a neutrally devised, pre-planned blueprint in order to eliminate arbitrariness and discretion has been this court's principal prerequisite for abandoning the requirement of individualized suspicion in roadblock stops. In Commonwealth v. Shields,402 Mass. 162, 165, 521 N.E.2d 987, 989-90 (1988), we noted with approval the position of other courts that control over the discretion of officers in the field is the key constitutional requirement. People v. Bartley, 109 Ill.2d 273, 289,486 N.E.2d 880, 887 (1985), cert. denied sub nom. Bartley v. Illinois,475 U.S. 1068, 106 S.Ct. 1384, 89 L.Ed.2d 608 (1986)."[8]Commonwealth v. Anderson, supra, 406 Mass. 349, 547 N.E.2d 1137; see also Michigan State Police v. Sitz, supra, 496 U.S. 452-53 (discussing limited discretion).
In Brown v. Texas, supra, 433 U.S. 51, the Supreme Court indicated the necessity of a "plan embodying explicit, neutral limitations on the conduct of individual officers." "Conducting roadblocks in accordance with such neutral criteria minimizes the risk `that the individual's reasonable expectation of privacy [will be] subject to the discretion of the official in the field.'" (Internal quotation marks omitted.) Commonwealth v.Shields, supra, 402 Mass. 164-65, 521 N.E.2d 989-90, quotingDelaware v. Prouse, 440 U.S. 648, 655, 99 S.Ct. 1391,59 L.Ed.2d 660 (1979).
The Anderson court went on to say that "[t]o allow the Commonwealth to do anything short of complying in full with its own guidelines would inject an element of discretion into the roadblock procedures and thus undercut the very foundation upon which the roadblock seizure is constitutionally justified." CT Page 4874Commonwealth v. Anderson, supra, 406 Mass. 350, 547 N.E.2d 1138.
In conclusion the court held that "[s]ince the Commonwealth's guidelines regulating roadblocks have been held to supply the `reasonableness' in these seizures that lack the usual probable cause or individualized suspicion requirements which ordinarily safeguard citizens from arbitrary government intrusion, we believe the fairest course is to require the Commonwealth to follow its own rules." Id., 351, 547 N.E.2d 1138; see also Brownv. Commonwealth, supra, at *2 (suppressing evidence and dismissing charge where police moved checkpoint without following prerequisites in guidelines; "[b]ecause the checkpoint did not conform to the guidelines adopted for the operation of DUI checkpoints and was, therefore, invalid, we hold that the warrantless stop of the appellant during the period of noncompliance contravened the protections of thefourth amendment").
In the present case, the aberrations from the guidelines are much more severe than those with which the Anderson court dealt. As articulated above, the State failed to prove notice was provided to the media and that the police were not required to ask the same questions to every motorist in order to curtail the discretion granted the police. Under the circumstances of this case, "the fairest course is to require the [state] to follow its own rules" to ensure the constitutionality of the stop. Id.
Further, the court determines that the police failed to even "substantially comply" with the guidelines, considering the essential nature of the publication requirements vis-a-vis fear, apprehension and deterrence and the constitutional necessity of circumscribing the discretion of the police in the conduct of the checkpoint. Compare Commonwealth v. Anderson, supra,406 Mass. 350-51, 547 N.E.2d 1138 (finding no substantial compliance); andBrown v. Commonwealth, supra, at *2 (finding no substantial compliance; "[w]e reject the Commonwealth's argument that the police substantially complied with the department's guidelines; relocating the roadblock for unauthorized reasons constituted noncompliance with the guidelines. Accordingly, the stop was an illegal seizure, and the evidence of intoxication obtained as a result should have been suppressed"); with State v. Boisvert, supra, 10 (finding substantial compliance where only apparent impropriety was failure to prove actual publication, not a requirement of AO, Sec. 16.1.6(b)); and People v. Banks, supra,6 Cal.4th 948-49, 863 P.2d 782 (finding substantial compliance CT Page 4875 where only impropriety was failure of publication, but requiring for federal constitutional purposes that the checkpoint be conducted "otherwise in conformance with the guidelines. . ."). Based on the precedent, the court finds that the State has not proven that the police substantially complied with the applicable guidelines.
In failing to even substantially follow its own guidelines, the State's subjective intrusion on the defendant's liberty interest in this case was substantial. That being the case, considering the totality of the circumstances in applying the Brown balancing test, the court finds that the scales tip in favor of the defendant.
Therefore, the court finds that the State has failed to carry its burden of proving that the DWI checkpoint occurring on June 4, 1994, that netted the defendant, was a reasonable seizure under the fourth amendment to the United States constitution and under the adequate and independent state ground of article 1, section 7 of the Connecticut constitution.[9]
As a result, the court grants the defendant's motion to suppress the results of the illegal stop, including the trooper's observations of the defendant and the subsequent evidentiary breath sample garnered, as fruit of the poisonous tree, obtained in violation of the fourth amendment; State v. Conger, 183 Conn. 386,392, 439 A.2d 381 (1981) (illegal stop of vehicle may require suppression of subsequently obtained evidence), citingWong Sun v. United States, 371 U.S. 471, 488, 83 S.Ct. 407,9 L.Ed.2d 441 (1963); and article 1, section 7 of the Connecticut constitution. State v. Dukes, 209 Conn. 98, 110, 547 A.2d 10
(1988) (Connecticut constitution article 1, section 7 has an independent exclusionary rule; "the exclusionary rule is now widely recognized as an effective remedy for enforcement of the constitutional protection against unconstitutional searches and seizures").
In light of the foregoing, the court declines to decide the motion to dismiss.
Leheny, J.