2007 OK CR 7

**Robert Jack LOOKINGBILL, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. F–2005–1235.**

Court of Criminal Appeals of Oklahoma.

March 20, 2007.

Francis R. Courbois, Oklahoma City, Attorney for Appellant at trial and appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jay Schniederjan, Assistant Attorney General, Oklahoma City, OK, Attorneys for Appellee on appeal.

Eric G. Yarborough, Assistant District Attorney, Mangum, OK, Attorney for State of Oklahoma at trial.

### ACCELERATED DOCKET ORDER

¶ 1 Appellant, Robert Jack Lookingbill, was charged by Information in the District Court of Greer County, Case No. CF–2004–36, with the following offenses: Count 1, Unlawful Possession of Controlled Drug (Methamphetamine); Count 2, Unlawful Possession of Marijuana; Count 3, Unlawful Possession of Paraphernalia; and Count 4, Transportation of Beer in Opened Container. A non-jury trial was held before the Honorable Richard B. Darby, District Judge, upon all four counts.

¶ 2 At the conclusion of trial, Judge Darby found Lookingbill guilty of Counts 3 and 4, and on December 1, 2005, imposed sentence. On Count 3, Judge Darby sentenced Appellant to one year in the custody of the Greer County Sheriff but suspended execution of sentence. On Count 4, the District Court imposed a fine of $25.00. In Counts 1 and 2, Judge Darby found the evidence presented to him at trial was sufficient to find Lookingbill guilty of a single count of felony possession of controlled dangerous substances, but based upon a pre-sentencing report, he deferred imposition of judgment and sentence for that offense for a period of five years. The District Court conditioned both its deferred sentencing order and its order suspending sentence upon written terms of probation.

### I. Procedural Status of this Appeal

¶ 3 Appellant now appeals from the Judgment and Sentence imposed on Counts 3 and 4, and from the order deferring judgment and sentence for possession of controlled dangerous substances. The rules of this Court, however, do not specifically recognize an appeal from an order deferring judgment and sentence when the order is entered following a trial. See Rule 1.2(D)(5), *Rules of the Oklahoma Court of Criminal Appeals*, Title 22, Ch. 18, App. (2006) (outlining method of appeal from final orders deferring judgment and sentence).

¶ 4 In *Gonseth v. State*, 1994 OK CR 9, ¶¶ 5–10, 871 P.2d 51, 53–54, this Court held that the right granted to a defendant by the statute now codified at 22 O.S.2001, § 1051(a), to appeal "from any judgment against him" extended to a defendant given a final order deferring judgment and sentence after a plea of guilty or nolo contendere. For the reasons expressed in *Gonseth*, we now hold that a right of appeal also accrues to a defendant who receives a final order deferring judgment and sentence following a bench trial or a jury verdict. Accordingly, we allow Lookingbill's appeal of the order deferring judgment and sentence.

¶ 5 Following commencement of his appeal, Appellant applied for placement upon this Court's Accelerated Docket under Section

XI, of the Court's *Rules*.[1] Without timely objection by Appellee, we assigned the case to the Accelerated Docket. At the conclusion of the oral argument held on September 28, 2006, the Court took Appellant's matter under advisement. We now decide this appeal.

## II. Background and Appellant's Claims of Error

¶ 6 The evidence presented below was the fruit of a driver's license checkpoint conducted by Oklahoma Highway Patrol officers in a rural area of Greer County. Lookingbill claims the conduct of the checkpoint violated the Fourth Amendment of the United States Constitution and that the District Court erred in denying his motion to suppress the evidence seized.

### A. Facts

¶ 7 On March 6, 2004, Highway Patrol Troopers Shawn Laughlin and Gary Cummins, after planning the matter over lunch, conducted (in Laughlin's words) a "driver's license safety checkpoint" in Greer County where northbound Highway 6 meets Highway 283. Laughlin began the operation of the checkpoint about 1:50 P.M. by standing on the dividing line of the two northbound lanes of Highway 6 and motioning all approaching traffic to stop.

¶ 8 Lookingbill's pickup truck was stopped early in the process. As Trooper Laughlin asked Lookingbill for his license and proof of insurance, he noticed an open twelve-ounce bottle of beer sitting in plain view "on the hump in the middle of the vehicle." Laughlin asked Lookingbill to pull over to the shoulder of the roadway.

¶ 9 He asked Lookingbill to hand him the bottle and noted that the liquid inside was cold and smelled like beer. Furthermore, as he was standing at the truck's window, he smelled what he "believed to be burnt marijuana coming from the cab of the pickup." The trooper asked Lookingbill to step back to the patrol car.

¶ 10 As Lookingbill walked to the patrol car, Laughlin saw him remove a marijuana pipe from his pants pocket and immediately replace it. The trooper then placed restraints on Lookingbill and asked him what the item was. Lookingbill said it was a marijuana pipe. Laughlin testified that the pipe contained a residue that smelled like burnt marijuana.

¶ 11 After taking the pipe from Lookingbill's pocket and placing him in the patrol car, Laughlin returned to the pickup truck and began looking through it. He found a blue glove under the armrest in the center of the front seat. Inside the glove was a film canister wrapped with black electrical tape containing two baggies, one holding marijuana and the other methamphetamine. Also inside the glove was a glass pipe with a white residue. Laughlin believed the pipe had been used to smoke methamphetamine.

¶ 12 Laughlin testified that he "advised Mr. Lookingbill what he was charged with" and "read him his *Miranda* rights." While Lookingbill initially denied owning a blue glove, he later admitted the drugs and the pipe were his. He explained that he smoked the methamphetamine to stay awake when driving large trucks and that he smoked the marijuana on his way back home.

### B. Appellant's Claims of Error

¶ 13 Prior to trial Lookingbill filed a motion to suppress. The motion claimed that all the evidence against Lookingbill was the result of his warrantless seizure at a checkpoint stop that violated the Fourth Amendment. Following an evidentiary hearing, the District Court denied Lookingbill's motion. During the subsequent bench trial, Lookingbill renewed his motion to suppress, and it was again overruled. On appeal, Lookingbill claims these rulings were error and asks that we reverse.[2]

---

1. Appellant's request for placement on the Accelerated Docket occurred prior to the Court's April 12, 2006, revision of Rule 11.3(C).

2. Appellant limits his suppression arguments to the validity of the checkpoint seizure; hence, this Court does not address the propriety of the search, arrest, or vehicle inventory procedures that occurred subsequent to the checkpoint stop.

### III.  Constitutionality of Vehicle Checkpoints

¶ 14 A "seizure" occurs within the context of the Fourth Amendment whenever police intentionally stop a vehicle at a checkpoint. *Michigan Dep't of State Police v. Sitz,* 496 U.S. 444, 450, 110 S.Ct. 2481, 2485, 110 L.Ed.2d 412 (1990) ("[A] Fourth Amendment 'seizure' occurs when a vehicle is stopped at a checkpoint."). Because the Fourth Amendment of the Constitution protects citizens from "unreasonable searches and seizures," the issue of whether a lawful seizure occurs at a checkpoint depends upon whether such seizure is reasonable under the circumstances.

¶ 15 The United States Supreme Court has articulated three factors to balance in making that determination:

The reasonableness of seizures that are less intrusive than a traditional arrest depends "on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers." Consideration of the constitutionality of such seizures involves [1] a weighing of the gravity of the public concerns served by the seizure, [2] the degree to which the seizure advances the public interest, and [3] the severity of the interference with individual liberty.

*Brown v. Texas,* 443 U.S. 47, 50–51, 99 S.Ct. 2637, 2640, 61 L.Ed.2d 357 (1979) (citations omitted).

¶ 16 In *Illinois v. Lidster,* 540 U.S. 419, 427, 124 S.Ct. 885, 890, 157 L.Ed.2d 843 (2004), the Supreme Court used these three factors to evaluate the reasonableness of seizures arising from a highway checkpoint. The Supreme Court held that "the police [checkpoint] stops were reasonable, hence, constitutional." *Id.* at 421, 124 S.Ct. at 888. In so holding, the Supreme Court distinguished the checkpoint operation before it from that disapproved in *City of Indianapolis v. Edmond,* 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000), a decision holding that checkpoints were unconstitutional if established "primarily for general 'crime control' purposes, *i.e.,* 'to detect evidence of ordinary criminal wrongdoing.'" *Lidster,* 540 U.S. at 423, 124 S.Ct. at 888–89 (quoting Edmond, 531 U.S. at 41, 121 S.Ct. at 454).

¶ 17 The *Edmond* decision involved a class action by motorists challenging the power of Indianapolis to operate vehicle checkpoints for the purpose of finding illegal narcotics. In holding the city's checkpoint program illegal, the Supreme Court first observed, "The Fourth Amendment requires that searches and seizures be reasonable. A search or seizure is ordinarily unreasonable in the absence of individualized suspicion of wrongdoing." Edmond, 531 U.S. at 37, 121 S.Ct. at 451.

¶ 18 The Court acknowledged that there were recognized exceptions to the "individualized suspicion" requirement, and it noted several of them. Among those exceptions were: (1) brief, suspicionless seizures of motorists at a fixed Border Patrol checkpoint designed to intercept illegal aliens; (2) sobriety checkpoints aimed at removing drunk drivers from the road; and (3) checkpoints with the purpose of verifying drivers' licenses and vehicle registrations. *Id.* at 37–38, 121 S.Ct. at 452.

¶ 19 Recognizing *Delaware v. Prouse,* 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979), as the case lending approval to driver's license checkpoints, the *Edmond* Court said:

In *Prouse,* we invalidated a discretionary, suspicionless stop for a spot check of a motorist's driver's license and vehicle registration. The officer's conduct in that case was unconstitutional primarily on account of his exercise of "standardless and unconstrained discretion." We nonetheless acknowledged the States' "vital interest in ensuring that only those qualified to do so are permitted to operate motor vehicles, that these vehicles are fit for safe operation, and hence that licensing, registration, and vehicle inspection requirements are being observed." Accordingly, we suggested that "[q]uestioning of all oncoming traffic at roadblock-type stops" would be a lawful means of serving this interest in highway safety.

We further indicated in *Prouse* that we considered the purposes of such a hypothetical roadblock to be distinct from a

general purpose of investigating crime. The State proffered the additional interests of "the apprehension of stolen motor vehicles and of drivers under the influence of alcohol or narcotics" in its effort to justify the discretionary spot check. We attributed the entirety of the latter interest to the State's interest in roadway safety. We also noted that the interest in apprehending stolen vehicles may be partly subsumed by the interest in roadway safety. We observed, however, that "[t]he remaining governmental interest in controlling automobile thefts is not distinguishable from the general interest in crime control." Not only does the common thread of highway safety thus run through *Sitz* and *Prouse,* but *Prouse* itself reveals a difference in the Fourth Amendment significance of highway safety interests and the general interest in crime control.

Edmond, 531 U.S. at 39–40, 121 S.Ct. at 453 (citations omitted).

■ ¶ 20 The *Edmond* Court rejected Indianapolis' argument that its checkpoint program could be "justified by its lawful secondary purposes of keeping impaired motorists off the road and verifying licenses and registrations," and the Court found if this were the case, "law enforcement authorities would be able to establish checkpoints for virtually any purpose so long as they also included a license or sobriety check." *Id.* at 46, 121 S.Ct. at 457. For that reason, the Supreme Court found that it must "examine the available evidence to determine the primary purpose of the checkpoint program."[3] *Id.*

### IV. The Record Sufficiently Supports the District Court's

### Decision to Uphold the Checkpoint in Appellant's Case

■ ¶ 21 It is evident from the cases discussed above that law enforcement officers, operating within certain parameters, may establish checkpoints for the purpose of verifying that drivers are licensed and that they are operating ostensibly safe vehicles.[4] The District Court concluded that the highway checkpoint seizure in Appellant's case was not constitutionally flawed. In reviewing the record, we find the evidence is sufficient to support that conclusion.[5]

■ ¶ 22 The law enforcement officers in this case testified that there was a "significant" problem of unlicensed drivers in Greer County, and this was their stated purpose for planning the driver's license checkpoint challenged here. The State offered proof showing that the officers chose the site because it was the route most traveled through Greer County. The checkpoint was in a fixed location, in broad daylight, and in an open area where the troopers could be easily seen. The officers planned to stop every passing car and, if everything was in order, to detain motorists for less than a minute.[6]

---

3. The Supreme Court noted that "while '[s]ubjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis,' programmatic purposes may be relevant to the validity of Fourth Amendment intrusions undertaken pursuant to a general scheme without individualized suspicion." *Edmond,* 531 U.S. at 45–46, 121 S.Ct. at 456 (citation omitted). Finding that Indianapolis' checkpoints had narcotics detection as their admitted primary purpose, the Supreme Court concluded, "When law enforcement authorities pursue primarily general crime control purposes at checkpoints ... stops can only be justified by some quantum of individualized suspicion." *Id.* at 47, 121 S.Ct. at 457.

4. Prior to any of the above-cited Supreme Court decisions, our Court had specifically recognized the legitimacy of what it called "nonselective wholesale driver's license and safety check by roadblock," and it held that "the state has the right to make routine and reasonable driver's license checks designed to insure the safety and welfare of its citizens by assuring that only licensed drivers are on the highways." *Brantley v. State,* 1976 OK CR 82, ¶¶ 2–4, 548 P.2d 675, 675–76.

5. When reviewing a trial court's ruling on a motion to suppress evidence based on an illegal seizure, "we defer to the trial court's findings of fact unless they are not supported by competent evidence and are therefore clearly erroneous," and "independently review[ ] the trial court's legal conclusions based on those facts." *Hallcy v. State,* 2007 OK CR 2, ¶ 5, 153 P.3d 66.

6. According to Trooper Cummins, their checkpoint plan included the contingency that if traffic should start to back up, vehicles would then be waved through so as not to cause any unreasonable delays in travel. A traffic backup never occurred, however, because Appellant was one of

¶ 23 The officers testified that the operation of this checkpoint was in compliance with Oklahoma Highway Patrol and Department of Public Safety policies and procedures for driver's license and safety checkpoints. Neither party offered a written copy of these policies and procedures.

¶ 24 Under this record, we affirm the trial court's overruling of Appellant's motion to suppress the State's evidence. Further to the extent that *State v. Smith*[7] is inconsistent with this opinion, it is overruled.

### V. Procedural Requirements

¶ 25 The operation of a vehicle checkpoint gives law enforcement officers the power to stop and detain, albeit briefly, a citizen without a warrant and without a reasonable suspicion of wrongdoing. A careless exercise of that power comes with great potential for abuse and even greater potential for the appearance of abuse from the perspective of the detained motorist. For that reason a checkpoint must be planned and carried out within the narrow constitutional parameters discussed in this opinion, and it is neither too onerous a burden on law enforcement nor unreasonable for the law to require specific showings of fact before a challenged checkpoint seizure will be upheld.

¶ 26 We hold, therefore, that law enforcement agencies operating checkpoints for constitutionally sanctioned purposes (e.g., to ensure that drivers are licensed) should have written standards for the conduct of such operations and policies in place to ensure compliance with those standards. In future cases, where the constitutionality of a checkpoint is challenged by a motion to suppress evidence, the prosecution will be required to introduce into evidence the agency guidelines governing the operation of the checkpoint at issue.

¶ 27 In order to be constitutional, the operation of a vehicle checkpoint must meet three overarching standards: (1) the operation must be rationally related to the stated public purpose; (2) the operation must be carried out in accordance with agency guidelines limiting officer discretion and assuring all motorists are treated equally; and (3) the operation must be planned and carried out in a manner that minimizes invasion of motorist privacy.

¶ 28 Specific factors to be considered in determining if those standards are met include: (1) the stated purpose of the operation; (2) the approval of superior officers; (3) the degree of compliance with the established agency standards; (4) the time, location, and duration of the checkpoint; (5) the steps taken to inform motorists of the reason for the stop; and (6) the duration of the individual stop.[8]

### DECISION

¶ 29 **IT IS THEREFORE THE ORDER OF THIS COURT** that the Judgment and Sentences of the Greer County District Court in Case No. CF–2004–36, convicting Appellant of Unlawful Possession of Paraphernalia (Count 3) and Transportation of Beer in Opened Container (Count 4), are **AFFIRMED.**

¶ 30 **IT IS THE FURTHER ORDER OF THIS COURT** that the order deferring imposition of Judgment and Sentence in CF–2004–36 for the offense of felony possession of controlled dangerous substances is **AFFIRMED, PROVIDED HOWEVER,** that the District Court is directed to correct the journal entry of its deferred sentencing order to reflect the merger of Counts 1 and 2. Pursuant to Rule 3.15 of this Court's *Rules,* **MANDATE IS ORDERED ISSUED** upon the filing of this decision.

the first vehicles through the checkpoint, resulting in the checkpoint being promptly disbanded once Trooper Laughlin arrested Appellant and transported him to jail.

7.   1984 OK CR 13, 674 P.2d 562.

8.   In providing specific guidelines governing the structure and operation of checkpoints, we join other state courts which have done the same. *E.g., LaFontaine v. State,* 269 Ga. 251, 497 S.E.2d 367, 369 (1998); *State v. Deskins,* 234 Kan. 529, 673 P.2d 1174, 1185 (1983); *Commonwealth v. Buchanon,* 122 S.W.3d 565, 570–71 (Ky.2003); *City of Las Cruces v. Betancourt,* 105 N.M. 655, 735 P.2d 1161, 1164–65 (1987).

¶ 31 **IT IS SO ORDERED.**

¶ 32 **WITNESS OUR HANDS AND THE SEAL OF THIS COURT** this 20th day of March, 2007.

/s/ Gary L. Lumpkin, Concur in Part/Dissent in Part
**GARY L. LUMPKIN, Presiding Judge**

/s/ Charles A. Johnson
**CHARLES A. JOHNSON, Vice Presiding Judge**

/s/ Charles S. Chapel
**CHARLES S. CHAPEL, Judge**

/s/ Arlene Johnson
**ARLENE JOHNSON, Judge**

/s/ David B. Lewis
**DAVID B. LEWIS, Judge**

LUMPKIN, Presiding Judge: Concur In Part/Dissent In Part:

¶ 1 I concur with the Court's decision affirming the validity of the drivers license checkpoint in this case, together with the judgment and sentence rendered. However, I cannot join in the adoption of the procedural requirements set forth in Section V. The "requirements" set forth by this Court have nothing to do with the adjudication of the judgment and sentence in this case. There is absolutely no evidence in this record, or for that matter, in any other case presented to this Court, that the procedures sought to be adopted are necessary. Further, this Court has not provided a remedy for those situations where their procedural requirements are not followed or are only partially followed.

¶ 2 The Court's attempt to tell law enforcement agencies how to operate checkpoints is only dicta, which renders this opinion merely an advisory opinion. This Court has consistently held that it does not issue advisory opinions. *See Murphy v. State,* 2006 OK CR 3, ¶ 1, 127 P.3d 1158 ("This Court does not issue advisory opinions"); *Canady v. Reynolds,* 1994 OK CR 54, ¶ 9, 880 P.2d 391, 394; ("this Court cannot otherwise issue advisory opinions"); Matter *of L.N.,* 1980 OK CR 72, ¶ 4, 617 P.2d 239, 240 ("An advisory opinion does not fall within the Court's original or statutory jurisdiction; neither does it come within its appellate review. To offer advice

in the form of an opinion would be to interfere with the responsibility of the trial court to exercise the powers confided to it").

¶ 3 This Court's action in this case does not adhere to the concept of the Rule of Law but is more of a legislative action than a judicial action. Policy decisions are for legislatures, not courts. All this decision reflects is appellate judges pontificating on what they would like to have law enforcement do in checkpoint situations. It is also another attempt by the Court to create precedent based, not on the law as adjudicated in a case, but upon dicta in a single opinion. For those reasons, I dissent to the adoption of any type of "procedural requirements".